**LOST TREE VILLAGE CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 08–117L.**

United States Court of Federal Claims.

Filed Under Seal: Aug. 19, 2011.

Reissued: Aug. 26, 2011.

Jerry Stouck, Greenberg Traurig, LLP, Washington, D.C., for plaintiff. With him on the brief and at trial was Danielle M. Diaz, Greenberg Traurig, LLP, Washington, D.C.

James D. Gette, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs and at trial was Brook B. Andrews, Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. With him on the briefs was Ignacio S. Moreno, Assistant Attorney General, Environment & Natural Resources Division. Of counsel was John Kasbar, Assistant District Counsel, United States Army Corps of Engineers, Jacksonville, Florida.

### OPINION AND ORDER [1]

LETTOW, Judge.

This post-trial decision concerns an alleged taking by the government of property for public use without providing just compensation to the property owner. Plaintiff, Lost Tree Village Corporation ("Lost Tree") sought a wetlands fill permit from the U.S. Army Corps of Engineers ("Corps") for a 4.99 acre tract of land ("Plat 57") bordering a cove on the Indian River in east central Florida. Lost Tree claims that the denial of that permit eliminated all economically viable use of Plat 57 and constituted a taking in contravention of the Takings Clause of the Fifth Amendment to the United States Constitution.

At the outset of the litigation, determination of the relevant parcel emerged as the key issue of the case. Previously, the court considered and denied a motion for partial summary judgment by Lost Tree and a cross-motion for partial summary judgment by the government respecting the relevant-parcel question. See Lost Tree Village Corp. v. United States, 92 Fed.Cl. 711, 722 (2010). A site visit to the property was conducted on January 31, 2011. Thereafter, a seven-day trial on liability and damages was held, first in Washington, D.C. from April 4 to 7, 2011, and then in Fort Pierce, Florida, from April 11 to 13, 2011. Post-trial briefing has been completed, and on July 21, 2011, the parties presented their respective closing arguments. The case is accordingly ready for disposition.

### FACTS [2]

#### A. Lost Tree Village Corporation

Lost Tree Village Corporation was started in 1959 in Florida by Mr. E. Llwyd Ecclestone. Am. Stip. of Fact for Trial ("Stip.") ¶¶ 1–2.[3] Mr. Ecclestone guided Lost Tree until his death in 1981, at which point his daughter, Mrs. Helen Ecclestone Stone, became Chairman of the Board. Tr. 757:17–20, 759:16–20 (Stone). Today, Mrs. Stone remains the Chairman of the Board and is the majority shareholder of Lost Tree, holding 93.6% of its shares. Tr. 756:8–10 (Stone); Stip. ¶ 4. The remaining interest in Lost Tree is divided into Subchapter S holdings for Mrs. Stone's two daughters, Mrs. Margaret B. Shaffer and Mrs. Sheila Biggs. Stip.

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before August 26, 2011. No redactions were requested; several minor corrections were made.

2. The recitation of facts constitutes the court's principal findings of fact in accord with RCFC 52(a). Other findings of fact and rulings on mixed questions of fact and law are set out in the analysis.

3. Citations to the transcript of the trial are to "Tr. ____." Citations to the transcript of the closing argument are to "Cl. Tr. ____." Plaintiff's exhibits are cited as "PX ____," and the government's exhibits are cited as "DX ____."

Stipulations of fact were initially filed by the parties in connection with their cross-motions for partial summary judgment. See Lost Tree, 92 Fed.Cl. at 712 n. 2. Amended stipulations were submitted by the parties in conjunction with the trial.

¶ 4. In 1994, Charles Bayer became the President of Lost Tree, and since that time he has been responsible for all business and financial operations of the company, including day-to-day management. *Id.* ¶ 5.

### B. *The 1968 Option Agreement*

Initially, Lost Tree operated as a land-development enterprise focused on land located near North Palm Beach. It then looked northward. In October 1968, Lost Tree entered into an option agreement (the "1968 Option Agreement" or the "Option Agreement") with the descendants of Fred R. Tuerk, which agreement permitted Lost Tree to purchase through the exercise of a series of separate options approximately 2,750 acres of property on the mid-Atlantic coast of Florida in Indian River County. Stip. ¶ 7; PX 1 (1968 Option Agreement). The lands subject to the Option Agreement were located in the general area of the Town of Indian River Shores, near the City of Vero Beach, and were comprised of numerous parcels, many of which were not contiguous to the largest tract. More specifically, the Option Agreement covered: (1) land on an unnamed barrier island ("Barrier Island") on the Atlantic Coast, which land is bisected by U.S. Highway A–1–A, (2) a westerly peninsula of the Barrier Island known as the "Island of John's Island" bordering the Indian River, (3) various other islands in the Indian River, including McCuller's Point, Gem Island, Pine Island, Sister Island, Hole–in–the–Wall Island, Fritz Island, and others, (4) submerged lands in and around the Indian River, (5) the "North Acreage" consisting of approximately 100 acres on the Indian River north of the Barrier Island, and (6) approximately 35 acres about five miles due west of Gem Island, known as the "West Acreage." Stip. ¶¶ 9, 83. The Option Agreement separated the parcels into nine conveyances, *i.e.,* Conveyances "A" through "I." *Id.* ¶ 10.

In February 1969, Lost Tree exercised the first of its options. Stip. ¶ 12. That option covered Conveyances "A" and "B," which conveyances related to the Barrier Island. *Id.* ¶ 21. Between February 1970 and August 1974, Lost Tree exercised five additional options to acquire the remaining property covered by the 1968 Option Agreement. *Id.* ¶ 13. The last exercised option related to Conveyance "C," which encompassed various parcels of land, including the Island of John's Island and Gem Island, an island in the Indian River to the northwest of the Island of John's Island. *Id.* ¶¶ 28, 31. Plat 57 lies on the north side of Stingaree Point, a smaller peninsula on the west side and at the southern end of the Island of John's Island. *Id.* ¶ 30; DX 50 (Map reflecting generally accepted boundaries of the community of John's Island).

The 1968 Option Agreement included a provision calling for "a tentative land development plan depicting ... proposed development of all of the land that extends from the Indian River to the Atlantic Ocean plus the lands comprising John's Island." PX 1 at LTVC015300 (1968 Option Agreement). The call for a development plan was rooted in the desire of Mr. Tuerk, Lost Tree's counterparty to the Option Agreement, "to have a say, and to make sure that his land and his town w[ere] going to be developed beautifully." Tr. 95:6–8 (Bayer). However, Mr. Tuerk died prior to the closing of the Option Agreement, and Mr. Tuerk's heirs did not share his views on the necessity of a development plan. *See* Tr. 99:19–22, 94:20–24 (Bayer). No plan such as the one contemplated by the Option Agreement nor any plan for developing all of the property covered by the Option Agreement has been found. Stip. ¶ 17. Sometime after 1994, Lost Tree conducted an "exhaustive search" to find an overall development or master plan,[4] which search was ultimately

---

**4.** This investigation was undertaken because the Town of Indian River Shores had sent to Lost Tree a letter requiring Lost Tree to cease its operation of the administration building in the community of John's Island within ten years because such building had a commercial use but was located in a residential zone. As part of its defense to that action, Lost Tree sought to find a master plan that would have allowed it to persist in its pre-existing non-conforming use. Tr. 95:21 to 97:9 (Bayer). After Lost Tree conducted its search for such a plan, and Mr. Bayer questioned numerous knowledgeable people of the Town of Indian River Shores, including Mr. Sherman Smith, a lawyer involved in the negotiations leading up to the Option Agreement, Lost Tree concluded that no development plan existed. Tr. 93:5 to 97:21, 98:17–19, 99:2–22 (Bayer).

fruitless Tr. 93:13 to 99:22 (Bayer).[5]

## C. Development of the Community of John's Island

Beginning in 1969, and continuing for many years, Lost Tree developed on a seriatim basis, through the recording of approximately 56 distinct plats, roughly half of the property covered by the Option Agreement. Stip. ¶ 18. Those approximately 1,300 acres ultimately became a gated residential community known as "John's Island." Id. Lost Tree, however, never owned all of the property encompassed by the gated community, and most knowledgeable people in the area would consider the community of John's Island to be inclusive of parcels which were neither covered by the 1968 Option Agreement nor ever owned by Lost Tree. Id. ¶¶ 19–20; see DX 50. Nonetheless, Lost Tree built the majority of the roads within the community and was responsible for the development of the infrastructure for the community. Tr. 266:17 to 267:13 (Bayer).[6]

Lost Tree first developed part of the Barrier Island, recording that property as "John's Island Plat 1" with the Town of Indian River Shores in March 1969. Stip. ¶¶ 21–23. The initial development on Barrier Island consisted of a golf course and cottages, condominiums, and homes. Id. ¶ 23. Lost Tree also developed infrastructure for the Barrier Island property, including streets, utilities, sewage systems, and a sewage treatment facility. Id. ¶ 22. Lost Tree continued to develop Barrier Island throughout the 1970s and up to the mid–1980s, eventually adding two golf courses, a beach club, golf cottages, a private hotel facility, and about 800 individual dwelling units. Id. ¶ 24. In the course of its development, Lost Tree recorded approximately 45 different plats on the Barrier Island, such plats covering mostly single-family homes. Id. ¶ 25.

In the late 1970s, Lost Tree turned its attention to the Island of John's Island and Gem Island. The first plat on the Island of John's Island, Plat 25, was filed in May 1980. Stip. ¶ 33. Shortly thereafter, in August 1980, Lost Tree submitted to the Corps an application (the "1980 Permit Application") for a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and a comparable permit application to the State of Florida's Department of Environmental Regulation. Id. ¶¶ 44–45. Attendant to the permit applications, Lost Tree submitted a "Development Plan" for the Island of John's Island and Gem Island. Id. ¶ 34; PX 33 (the "1980 Development Plan"). The 1980 Development Plan "propose[d] the creation of some 200 single family residences on about 400 acres of land." Id. ¶ 40.

Along with technical proposals, the 1980 Development Plan stated more generally, "The development concept of the Island of John's Island and Gem Island relies upon the natural recreational interchange between people and an aesthetically beautiful environment…." Stip. ¶ 39. The Plan represented also that "[t]he development is 90% in existing upland areas requiring no governmental regulatory agency permitting [and] [p]rotection of some 35.37 acres of existing mangrove islands is proposed as per John Island's Preservation Society agreement and … Lost Tree Village Corporation." Stip.

---

5. A 2001 appraisal done by Mr. Peter Armfield, a real estate appraiser in Florida, for Lost Tree in regards to three lots on a tract on the Island of John's Island, Plat 55, states, "John's Island was established in 1969 and is a private 1,650 acre residential community, whose master plan limits the overall development to 1,382 residential properties, or one unit per acre when John's Island is completed." DX 100 ("An Appraisal of Three Single Family Lots Located Along Stingaree Point in John's Island, Town of Indian River Shores, Florida" (Oct. 24, 2001)) at LTVC017503. When questioned about the "master plan" to which Mr. Armfield was referring, Mr. Armfield testified that he had never seen such a master plan, and he could not identify from where he learned that there was a master plan or that John's Island would be completed once 1,382 homes were built. See Tr. 663:11 to 664:19 (Armfield).

6. The community of John's Island has a homeowners' association known as the John's Island Property Owners Association ("JIPOA") to which over 90% of the homeowners in the community belong. Stip. ¶ 124. JIPOA, an entity unaffiliated with and not controlled by Lost Tree, provides security services, maintenance of common areas, architectural review of properties, and runs the golf courses in the community. Id. ¶¶ 126, 131–32, 136–38. Membership in JIPOA is detached from property ownership in the community, requiring separate application. Id. ¶ 138.

¶ 40. No agreement between the John's Island Preservation Society and Lost Tree has been found, *id.* ¶ 42, and "it appears that the Preservation Society was never formed." *Lost Tree,* 92 Fed.Cl. at 714. However, several drawings were attached to the 1980 Development Plan, including one in which a substantial portion of what much later became Plat 57, among other areas, was shaded in green and labeled a "wildlife preserve." Stip. ¶ 35.[7]

In the 1980 Permit Application, Lost Tree sought approval for numerous infrastructure improvements, including the construction of causeways, one to connect Barrier Island to the Island of John's Island, and one to connect, along with a bridge, Gem Island to the Island of John's Island. Stip. ¶ 43. The Application addressed as well the placement of culverts on the Island of John's Island to permit water flow, the placement of fill in some wetland areas on the Island of John's Island to create developable lots, and the dredging of various canals in wetland areas around the Island of John's Island, including a U-shaped canal that would be located at the southwesterly point of the Island of John's Island near Chambers Cove, an arm of the Indian River bordering Plat 57. *Id.* ¶¶ 43, 47. Among other things, these improvements were intended to "interconnect the John's Island Development [on the Barrier Island] with the Island of John's Island ... and Gem Island," *id.* ¶ 37, as well as to provide waterfront access for lots.

On January 20, 1982, Lost Tree received a letter from the State of Florida notifying it of changes to the 1980 Permit Application that would be required to gain approval. Stip. ¶ 48. Although the Corps determined by the Spring of 1982 that it would approve the application, it could not do so without approval or waiver by Florida. *Id.* ¶¶ 49–50. Ultimately, the Corps never acted upon the 1980

Permit Application as submitted in its original form. *Id.* ¶ 53.

On August 2, 1982, Lost Tree submitted to the Corps a revised proposal, including drawings depicting Lost Tree's proposed alterations to the 1980 Permit Application. Stip. ¶¶ 54–55. The new application reflected various changes from the 1980 Permit Application, including, among other things, the elimination of the proposed causeway and bridge to Gem Island, the reduction of wetlands fill, and the deletion of three proposed canals, including the U-shaped canal near Chambers Cove. *Id.* ¶ 54. Additional revised plans submitted October 1, 1982 stated that "all originally proposed project features are being deleted from this application except the bridge from John[']s [Island] to Gem Island and its approaches." PX 122 (1982 Permit (Dec. 7, 1982)) at ID00485. On December 7, 1982, the Corps issued a permit to Lost Tree which did not approve the bridge but rather approved the following structural changes: (1) construction of the causeway connecting Barrier Island to the Island of John's Island;[8] (2) installation of a 4,000–foot canal with a bottom width of 68 feet; and (3) removal of an earthen plug at the southern tip of the Island of John's Island to separate that isthmus from the Barrier Island and allow flushing of water in John's Island Sound. Stip. ¶ 57; PX 122 at ID00417–42 (1982 Permit).

Development of the Island of John's Island and Gem Island proceeded throughout the 1980s and 1990s, and was accomplished by approximately 21 different plats, all of which contained lots for single-family homes. Stip. ¶ 32. In 1983, Lost Tree received a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, allowing the installation of a causeway and bridge to connect the Island of John's Island and Gem Island, *id.* ¶¶ 61, 62, 64, 65, and in 1993, Lost Tree received a Section 404 permit for the construction of a

---

7. Another drawing accompanying the Public Notice associated with the 1980 Permit Application labels a significant portion of Plat 54 (discussed *infra,* at 421) as a "wildlife preserve" and another portion of Plat 54 as "an out parcel not to be platted as a plot." Stip. ¶ 59.

8. The purpose of the causeway was to "provide[ ] access from the main part of [the community of]

John's Island to the [Island of John's Island] without having to go outside of the community," allowing homeowners on the Island of John's Island, for example, to "drive to the ... golf club without having to get outside the community." Stip. ¶ 70.

second canal on the north end of the Island of John's Island, *id.* ¶ 67. During this period of development, various parcels were also reserved as conservation easements by deed restrictions recorded by Lost Tree in favor of the local, state, or federal government. *See, e.g.,* Tr. 221:14 to 222:12 (Bayer) (recounting a conservation easement granted in connection with approval for Plat 46 pursuant to a 1983 permit); Tr. 222:13–22 (Bayer), Tr. 418:12 to 419:19 (Test. of Steven Melchiori, who provided surveying and civil engineering services to Lost Tree) (both recounting a conservation easement granted in connection with approval for Plat 53 pursuant to a 1993 permit).

Development of Stingaree Point, the westerly peninsula of the Island of John's Island on which Plat 57 lies, began in November 1985 with the recording of Plat 40, which plat was comprised of six lots on the south and east side of the Point. Stip. ¶ 71. Access to the lots on Plat 40 "was provided by a new road constructed roughly up the center line of the Point, called Stingaree Point Road." *Lost Tree Village,* 92 Fed.Cl. at 715. Attendant to the development of Plat 40, in 1985, Lost Tree also installed water and sewer lines and "stubbed out" the lines to the six lots of Plat 40. Stip. ¶ 102.[9] The lots on Plat 40 were sold and homes were built on those properties within a few years of the recording. Stip. ¶ 71. Also in 1985, Lost Tree stubbed out water and sewer service to a tract at the southeastern end of Stingaree Point, which tract was eventually recorded as Plat 55 in 1998. Stip. ¶ 103. Such services were not then extended to then-unplatted area that later became Plat 57, and to date, Lost Tree has never stubbed out those services to Plat 57. *Id.*

An April 30, 1986 appraisal entitled "John's Island Remaining Real Estate and Related Assets" evaluated the status of development of John's Island and Stingaree Point at that time. PX 56. The appraisal stated: "A project-by-project budget for all remaining development costs to complete John's Island is contained in Exhibit D." *Id.*

at LTVC0013490. Page 5 of Exhibit D to the appraisal, entitled "Remaining Development Costs—Stingaree Point," states "Stingaree Point development is substantially completed, with the exception of the entrance area, landscaping and a final layer of asphalt on the road." *Id.* at LTVC013533; *see also* Tr. 238:2 to 240:16 (Bayer) (concurring with the 1986 appraisal's opinion that Stingaree Point was substantially completed as of April 1986). The exhibit to the appraisal does not mention Plat 57.

In 1989, Lost Tree recorded all 40 lots on Gem Island as Plat 52, PX 68 (Copy of Plat 52), and began selling those lots to individual home builders in 1990. Stip. ¶ 75. Subsequent to the recording of Plat 52, Lost Tree recorded two plats apart from Plat 57 inside the community of John's Island: Plat 53, recorded in 1993, was a replatting on the Barrier Island which divided an existing lot, PX 72 (Copy of Plat 53); Tr. 1379:22 to 1380:1 (Melchiori), and Plat 55, recorded in 1998, PX 81 (Copy of Plat 55); Tr. 132:15–22 (Bayer).

### D. *The Operations of Lost Tree Village from 1994 Onward*

In 1994, Lost Tree hired Mr. Bayer as its President. Stip. ¶ 81. Mrs. Stone stated that she hired Mr. Bayer "[b]ecause [Lost Tree had] finished development, and [it] was looking for new investments of different varieties . . . [m]ainly commercial real estate." Tr. 756:14–20. Mr. Bayer concurred in this assessment of Lost Tree's new focus, stating that he "was brought on to take the company in a new direction, new investments." Tr. 82:6–7; *see also* Tr. 371:11–16 (Bayer) ("[Mrs. Stone] wanted to buy office buildings. . . . [S]he basically wanted me to take the company in another direction."). Mr. Bayer pursued Lost Tree's new focus by "invest[ing] a fair amount of stocks and bonds into real estate investments, triple net leased office buildings around the country, where [Lost Tree] would buy a building that was leased to [a company] . . . and had very little management involvement . . . and collect the rent." Tr. 83:20 to 84:1.

---

**9.** All infrastructure must be completed on a parcel or a developer must post a bond for 115 percent of the engineer's estimate for the cost of the improvement before a parcel may be recorded as a plat in the Town of Indian River Shores. Tr. 411:13–21 (Melchiori).

Mr. Bayer described the state of Lost Tree's business at the time of his arrival in 1994 as quiescent. When Mr. Bayer joined Lost Tree, the company had two employees: Frankie Faulkner, who served as a secretary and accountant, and Mrs. Stone. Tr. 106:20–22; Stip. ¶ 159.[10] Mr. Bayer testified that developmental activities inside the community of John's Island were "done," and Lost Tree's developmental operations had ceased in reality "[f]ive years earlier than [his] arrival." Tr. 106:23 to 107:2; *see also* Tr. 83:7–9 (Bayer) ("[T]he actual involvement of Lost Tree Village Corp. with the community had ceased 4 or 5 years before I showed up."); Tr. 106:3–4 (Bayer) (testifying that the last road was built and last utility stubbed out in 1989). Mr. Bayer elaborated, "There was no business at all really. The business had been effectively shut down. So [Lost Tree wasn't] in the business of real estate development. They weren't in any business. They were a landowner." Tr. 107:9–14; *see also* Tr. 83:12 (Bayer) ("They were basically doing nothing [at the time of his arrival]."); Tr. 391:2, 392:2–14 (Melchiori) (Lost Tree's development work in the community of John's Island was "[b]asically completed" in 1995 and infrastructure development had been completed "probably three or four years, five years prior to that . . . around 1990").[11]

At this time, Lost Tree was experiencing negative cash flow and the shareholders were paying Lost Tree's expenses out of their personal funds, with payments needed for real estate taxes, insurance, and other expenses associated with Lost Tree's ownership of residual properties in Indian River County. Tr. 370:5–8 (Bayer); Tr. 82:9–11 (Bayer) ("[Lost Tree] was about a million dollars a year in negative cash flow."); Tr. 84:7–11 (Bayer) (Lost Tree's remaining property was "eating cash quite quickly, because [Lost Tree] basically had to pay taxes and insurance on it, and it wasn't generating any income.").

In 1995, Lost Tree hired Ms. Laura Zerbock to establish an accounting department to support Lost Tree's changed business purpose. Ms. Zerbock joined Lost Tree as Vice President but her title changed to Chief Financial Officer once she received her license as a certified public accountant. Tr. 802:24 to 803:4. Ms. Zerbock testified at trial as to her understanding of Lost Tree's purpose in hiring her: "We were taking the company in a new direction. We were buying commercial buildings, and I was hired to set up an [a]ccounting [d]epartment and move the company financially in the direction where we were going to create a cashflow stream to Helen Stone and her daughters." Tr. 805:16–22; *see also* Tr. 803:11–16 (Zerbock) ("We were moving in a new direction. We were buying commercial buildings throughout the country, and I was analyzing potential commercial properties."); Tr. 808:3–7 (Zerbock) (Lost Tree intended to utilize funds generated from the sale of residual properties to buy commercial buildings). As for the state of Lost Tree's development operations at the time of her arrival, Ms. Zerbock stated that "[a]s far as [she] was concerned, the chapter [of Lost Tree's development operations] had already been closed [and] [she] was hired to start the new chapter." Tr. 831:7–14; *see also* Tr. 830:24–25 (Zerbock) (Lost Tree was "no longer in the business of development" in 1995.).

Upon her arrival in 1995, Ms. Zerbock effected the change of Lost Tree's Standard Industrial Classification ("SIC") on its federal tax return from real estate development to miscellaneous real estate. Lost Tree then adopted a method of tax accounting that was not permissible for real estate developers.

10. The state of Lost Tree's work force in 1994 stands in contrast to Lost Tree's prior employment of approximately 250 people in 1980. Stip. ¶ 159.

11. Mrs. Stone stated that although in her opinion development was not yet done in John's Island in 1994, Lost Tree had "got out of the development business in 1995." Tr. 772:17–22; *see also* Tr. 786:6–16 (Stone) (identifying the sale of Lost Tree's remaining platted lots to Gem Island In-

vestment L.P. in 1995 as marking the end of development operations for Lost Tree). Mrs. Stone testified in her deposition as well that she currently considered Lost Tree in the property development business "in part" in regards to John's Island, but at trial she clarified that she was unsure of this answer, stating that she is not aware of the operations of Lost Tree's business activities because Mr. Bayer runs all aspects of the company. *See* Tr. 776:19 to 777:24.

*See* Tr. 805:24 to 807:11 (Zerbock) (testifying that the changes in Lost Tree's tax status and accounting methods were initiated because Lost Tree was "no longer in the business of development, and [it] w[as] in the business of buying commercial buildings"); Tr. 843:6–23 (Zerbock) ("[T]o me[,] the implication [of changing the SIC code] was huge in that it was we were no longer in the business of development; that we were going to be purchasing properties and buying up commercial buildings."); *see also* Tr. 107:20 to 109:22 (Bayer) (explaining in detail Lost Tree's former and new method of accounting).[12] The Internal Revenue Service subsequently audited Lost Tree in 2000, and the Service upheld Lost Tree's new practices. Tr. 108:25 to 109:1 (Bayer).

As president, Mr. Bayer was tasked with stopping Lost Tree's negative cash flow, investing in new cash-flowing investments, Tr. 82:10–11, 83:16–18 (Bayer), and ultimately "get[ting] [Lost Tree and Mrs. Stone] out of . . . John's Island," Tr. 370:12–14 (Bayer). In this regard, Mr. Bayer testified that Mrs. Stone "wanted Lost Tree Village Corp. essentially shut down. She didn't want to have anything to do with employees, or activities, or risk, and so we sold off all the remaining plat[t]ed lots." Tr. 84:21 to 85:4, 370:20–22 (Bayer) (stating that Mrs. Stone was "finished, and she wanted to sort of extricate herself of all involvement with the community"). Thus, Mr. Bayer set out essentially to "liquidat[e] the corporation to the extent that [he] could," Tr. 112:11–12 (Bayer), by "pursu[ing] the sale or other disposition of property that Lost Tree still owned" in and around the Indian River area. Stip. ¶ 83; *see also* Tr. 84:12–13 (Bayer) ("I quickly decided to dispose of everything that [Lost Tree] had that wasn't producing cash."); Tr. 829:16 to 831:12 (Zerbock) (testifying as to Lost Tree's objective to dispose of the remaining properties left on the balance sheet). Describing her impression of Lost Tree's

treatment of its residual properties at this time, Ms. Zerbock stated that the remaining parcels were "like dead wood that we were trying to clean up and get rid of." Tr. 808:13–14; *see also* Tr. 830:25 to 831:1 (Zerbock) (The remaining properties Lost Tree possessed were "all just like leftover noise that [Lost Tree] w[as] not really focused on.").

To dispose of Lost Tree's remaining properties, however, Mr. Bayer first had to determine what Lost Tree actually still owned. Mr. Bayer testified, "[T]he first thing is that I had to find out what we owned. When I showed up, nobody really knew what physically the company owned. . . . I spent really weeks and months figuring out what the company owned." Tr. 87:22–24, 88:14–15; *see also* Tr. 89:5–8 (Bayer) ("I am getting all these tax bills . . . , and I had no idea what they were for, or what they related to."). To assist him in the task of uncovering Lost Tree's remaining properties, Mr. Bayer hired Mr. Steven Melchiori on a consulting basis in the fall of 1995. Tr. 88:20–25 (Bayer); Tr. 446:19 to 447:6 (Melchiori).

Mr. Melchiori is a professional surveyor and mapper, Tr. 386:21, and a principal in a construction management company in Vero Beach, known as Onsite Management Group. *See* Tr. 386:10–13, 390:8–9 (Melchiori). Formerly, Mr. Melchiori worked for an engineering firm that handled surveying and civil engineering tasks associated with the development of John's Island from 1981 to 1987, and Mr. Melchiori personally handled many of those plat-development projects. *See* Tr. 387:6–8, 388:3–4 (Melchiori). Mr. Melchiori concurred with Mr. Bayer's account of Lost Tree's affairs as of his hiring in 1995, stating that he "d[id]n't believe that anybody who was working there at the time really had any idea . . . where the property was and what it entailed." Tr. 447:10–14.

---

12. As explained in *Lost Tree:*

Prior to 1996, in accordance with [S]ection 262(a) of the Internal Revenue Code, Lost Tree had capitalized infrastructure costs, employee and office overhead, and other development costs that benefitted multiple lots and added an allocated share of those costs to the tax basis of property Lost Tree sold. Subsequent to its

change of business purpose, Lost Tree treated its operational costs as an expense, which would not have been permissible for a company in the business of developing and selling real property.

92 Fed. Cl. at 715 n. 10 (internal quotation marks and citation omitted).

Using his own recollection and by consulting tax bills for prior years, Mr. Melchiori, in conjunction with Mr. Bayer, was able to determine what properties Lost Tree owned as of 1995, *see* Tr. 89:3–12 (Bayer), and he created a list of all of Lost Tree's known properties. *See* PX 74 (1995 List of Lost Tree Properties); Tr. 447:21 to 448:13 (Melchiori). The 1995 List revealed that Lost Tree owned remaining properties both inside and outside of the community of John's Island. Within the community of John's Island, Lost Tree had "[n]ot much [land], ... just scattered pieces here and there," Tr. 452:1–2 (Melchiori), apart from a number of remaining unsold lots on Plat 52 on Gem Island. *See* PX 74 (1995 List). Outside the community of John's Island, Lost Tree's principal remaining properties consisted of: (1) the West Acreage; (2) the North Acreage, and (3) the Lost Tree Islands, consisting of approximately 500 acres on scattered islands in the intercoastal waterway. *See* Stip. ¶ 83; PX 74 (1995 List); PX 120 (Map reflecting generally-accepted boundaries of community of John's Island).

With the 1995 list in hand, Mr. Bayer determined the order and manner of disposition of the residual properties by "look[ing] at each parcel and figur[ing] out what [he] should do with it, and how to maximize how much money [Lost Tree] w[as] going to get for it." Tr. 104:4–7 (Bayer); *see also* Tr. 451:2–15 (Melchiori) (testifying that he would assist Mr. Bayer in evaluating the properties Lost Tree owned and that Mr. Bayer decided "what if anything to do with them"). Because the larger parcels had the most significant tax bills, Lost Tree focused on selling the more substantial properties first. *See* Tr. 117:21–25 (Bayer).

Mr. Bayer first disposed of the remaining substantial parcel within the community of John's Island, namely Plat 52, which in 1995, Lost Tree sold to Gem Island Investment L.P. in a bulk sale. *See* Stip. ¶¶ 76–77; PX 73 (Deed for Plat 52); Tr. 110:5–9 (Bayer) (recounting how two or three months after he arrived at Lost Tree he arranged the sale of all remaining platted parcels in the community of John's Island to Gem Island Investment L.P.); Tr. 112:16–17 (Bayer).[13] After this transfer, Lost Tree did not own any platted lots within the community of John's Island. Putting aside *de minimis* slivers of property, it owned approximately a dozen unplatted parcels within the community. Those properties consisted of the then-unplatted areas that became Plat 54, Plat 55, and Plat 57, a handful of scattered wetland or mangrove-covered parcels, and undevelopable wetlands. *See* Tr. 452:10 to 456:13 (Melchiori).

Plat 55 was recorded in January 1998 and consists of three lots near the southeasternmost base of Stingaree Point. Stip. ¶ 88; PX 81 (Copy of Plat 55). This parcel had been developed and the infrastructure for it laid in 1985 when Stingaree Point was developed. Tr. 133:6–9 (Bayer); Stip. ¶ 103. Lost Tree did not list the property for many years thereafter because of the consistently increasing value of intercoastal property, and the property is now, in Mr. Bayer's view, "worth more than people are willing to pay for it." Tr. 135:3–8, 136:2–11 (Bayer). A 323–foot strip of land lies between Plat 55 and Plat 57. Tr. 1379:7–15 (Melchiori); Stip. ¶ 97. That strip consists largely of a very narrow shoulder to Stingaree Point Road, several feet in width, which drops to water and marsh.[14]

**13.** Gem Island Investment L.P. is owned 60% by Mrs. Stone and 20% each by Subchapter S entities for her daughters, Mrs. Shaffer and Mrs. Biggs. Stip. ¶ 76. It was established by Mr. Bayer approximately two to three months subsequent to his arrival at Lost Tree, Tr. 110:5–9, 294:7–14 (Bayer), for the purpose of allowing Mrs. Stone's daughters to get involved in the business, Tr. 116:22–25 (Bayer). Mr. Bayer serves as its president, Tr. 297:20–24 (Bayer), and manages its day-to-day operations, Tr. 299:7–9 (Bayer). Following its creation, Gem Island Investment L.P. purchased other lots in many localities outside Florida. Tr. 294:22 to

295:7 (Bayer). Gem Island Investment L.P. pays Lost Tree $5,000 a month to do its accounting. Tr. 312:23–24 (Bayer). Today, the company does not have active employees and "[i]ts only assets are limited partnership interests in other partnerships." Tr. 298:6–11 (Bayer). By 1999, Gem Island Investment, L.P., had sold the remaining lots on Gem Island. Stip. ¶ 76.

**14.** The shoulder of the road is deeded to JIPOA. Lost Tree owns a strip of water and marsh next to the shoulder. The potential utility of that strip was the subject of some testimony during trial.

In July 1997, Lost Tree identified as Plat 54 three lots on the small peninsula called Horse's Head, and submitted a Section 404 wetlands fill permit application for this property. Stip. ¶ 89. While the permit application was pending, Lost Tree sold the property to Horse's Head Ltd., and the permit application was amended to reflect that change in ownership. *Id.* ¶ 91; PX 80 (Deed for Plat 54).[15] Lost Tree also sold to Horse's Head Ltd. in December 1997 several properties for use as mitigation for the Plat 54 permit, including Hole–in–the–Wall Island, tracts on the north and south causeway, and other islands. Tr. 150:11 to 151:3 (Bayer).

Additionally, during the several years after 1995, Lost Tree sold various buildings and assets associated with the community of John's Island. Lost Tree sold the administration building to the John's Island Club, Inc., Tr. 174:1–11 (Bayer), which sale physically extricated Lost Tree from the community of John's Island, Tr. 173:15–16 (Bayer). In September 1999, Lost Tree sold John's Island Real Estate Company, a real estate brokerage firm owned by Mrs. Stone and trusts for her daughters, that historically had handled most sales of home-site lots in the community of John's Island. Tr. 158:25 to 159:9, 166:15 to 167:7 (Bayer); PX 130 (Deed for the sale of John's Island Real Estate Company).[16]

Respecting the residual properties located outside of John's Island, Lost Tree put the North Acreage and West Acreage properties on the market almost immediately after Mr. Bayer's arrival at Lost Tree in 1994. *See* Tr. 104:1–4, 204:24–25 (Bayer). Lost Tree sold most of the North Acreage in 1999 to a developer which built single-family homes and condominiums on the property. Stip. ¶ 84; PX 89 (Deed conveying North Acreage). In 2004, Lost Tree sold the West Acreage, which originally consisted of approximately 35 acres, together with approximately 190 contiguous acres that Lost Tree had acquired in the 1980s, to Lost Tree Preserve, LLC and that property is currently being developed into a residential community known as Lost Tree Preserve. Stip. ¶ 86.[17] In January 2003, Lost Tree sold the Lost Tree Islands to the City of Vero Beach and the Town of Indian River Shores as part of the resolution of a takings claim against those entities. *Id.* ¶ 85 (citing *Lost Tree Village Corp. v. City of Vero Beach,* 838 So.2d 561 (Fla.Dist.Ct.App.2002)); Tr. 131:12 to 132:10 (Bayer).[18] Lost Tree also sold the smaller residual properties it owned which were outside of the community of John's Island. In early 2003, it sold a house it owned on Silver Shores Road, a few miles removed from the John's Island community but closer to the Lost Tree Islands. Tr. 194:14–18, 195:25 to 196:3 (Bayer). Additionally, it sold three parcels on Highway A–1–A

---

Mr. Melchiori stated that the strip was unusable. *See* Tr. 1379:15–21. He testified also that he "believe[d] you could construct a sidewalk within the current plat of right of way between those two plats, but ... [y]ou could not put that sidewalk in on property that's owned by Lost Tree Village. The right of way for the road is turned over to [JIPOA]. That's where the sidewalk would have to go." Tr. 1416:9–17.

15. Over 85% of the stock of Horse's Head Ltd. was owned in equal shares by the Margaret B. Shaffer Revocable Trust and the Sheila Biggs Revocable Trust, Stip. ¶ 92, with Mrs. Stone owning the remaining shares, Tr. 299:16 to 300:2 (Bayer). Mr. Bayer assisted with its organization. Tr. 299:14–15 (Bayer). Plat 54 was sold to Horse's Head Ltd. at fair market value for $100,000 pursuant to an appraisal Lost Tree commissioned. Tr. 151:4–13 (Bayer). In 2000, Horse's Head Ltd. received a wetlands fill permit from the Corps to fill 2.66 acres of Plat 54, and Horse's Head subsequently sold the platted home

sites. Stip. ¶ 93. Horse's Head Ltd. no longer exists today. Tr. 300:12–14 (Bayer).

16. In March 1998 and August 1998, Lost Tree also sold to a local developer the lots at the Environmental Learning Center ("ELC"), which lots are located outside the community of John's Island on the North Acerage. Tr. 138:23 to 139:13, 156:15–22 (Bayer); PX 84 (Deed conveying ELC Lots).

17. The precise ownership of Lost Tree Preserve, LLC, was not established at trial, but Mr. Bayer manages and directs the activities of that company, along with Mrs. Stone's daughters, Mrs. Shaffer and Mrs. Biggs. Tr. 1376:15–22 (Melchiori).

18. The takings claim had its genesis in the denial of permits to Lost Tree by the Town of Indian River Shores in 1990 and 1999 for development at the Lost Tree Islands. *See Lost Tree,* 838 So.2d at 566.

in the same vicinity as the Silver Shores Road home. *See* PX 107 (Deed conveying three parcels).

### E. *The Advent of Plat 57*

As noted, Plat 57 is located on the Island of John's Island, on the north side of Stingaree Point, and is among the properties acquired by Lost Tree pursuant to the last option exercised under the Option Agreement. Stip. ¶¶ 94, 98. It is located within the gated community of John's Island, *id.* ¶ 133, and access to the plat may only be gained by entrance through one of the gates at the edge of the community of John's Island, which gates Lost Tree constructed but no longer owns. Tr. 265:12–19, 376:7–8 (Bayer). The land constituting Plat 57 "contains a mangrove swamp and wetlands that have been disturbed by scattered upland spoil mounds vegetated by an invasive species of pepper, and by manmade ditches installed for mosquito control." Stip. ¶ 99.[19] The ditches and mounds were constructed by the Florida "Mosquito Control" authority, Tr. 178:5–10 (Bayer), and produced a cross-hatched pattern over Plat 57. An aerial photograph of Plat 57 taken in 1960, Tr. 1388:1–2 (Melchiori), is appended as Exhibit A.[20] It consists of 4.99 total acres of land, 1.41 acres of which are submerged lands, and 3.58 acres of which are wetlands with some uplands. Stip. ¶ 95.

Plat 57 is adjacent to other property on the Island of John's Island that was purchased via that same transaction. Stip. ¶ 96. To the east of Plat 57 is a strip of land that is a mosquito control impoundment, which land is separated from the roadway by a utility easement that has been deeded to JIPOA. *Id.* ¶ 97. To the east of the mosquito control impoundment, a 323–foot strip of land divides Plat 57 from Plat 55. *Id.* To the west of Plat 57 is Lot 1 of Plat 40, on which a substantial house was constructed in the 1980s. *Id.* To the north of Plat 57 is the Indian River, specifically the inlet known as Chambers Cove. *Id.* To the south of Plat 57 is Stingaree Point Road, which separates Plat 57 from other lots on Plat 40. *Id.*

The then-unplatted parcel constituting Plat 57 was present on Mr. Melchiori's 1995 list. *See* PX 74 (1995 List) (listing "wetlands north of Lots 1, 2, 4, & 5 Plat 40"); Tr. 516:9–19 (Melchiori) (identifying wetlands on PX 74 as Plat 57 and indicating that such listing meant Lost Tree was aware it owned Plat 57 in 1995). Despite this listing, Mr. Bayer testified that "Lost Tree Village didn't get a tax bill on Plat 57 from like '96 until 2002, 2004. We didn't get a tax bill on it, so it wasn't on anyone's radar screen, and until they went on their tour o[f] what properties did Lost Tree Village Corp[.] own, I didn't know we owned it, and nobody did." Tr. 232:17–23.[21] Mr. Bayer later clarified that if Lost Tree had been assessed taxes on Plat 57 during this period, "it would not have risen to a level" that would have made Lost Tree dispose of the property quickly. Tr. 1423:5–15. Ms. Zerbock testified similarly, stating that the property constituting Plat 57 had not "come up" as a source of discussion for Lost Tree from the time she joined in 1995 until 2002. Tr. 841:15–20.

Mr. Bayer testified that prior to approximately 2001 through 2002, Lost Tree "never considered developing [Plat 57] ... into a home[ ]site or anything else." Tr. 234:9–13. Indeed, "[p]rior to 2001–02, property within Plat 57 was sometimes left blank in development maps and plans." Stip. ¶ 108; *see also* Tr. 932:2–16 (Ms. Sadowski, Section Chief of

---

**19.** The species of pepper is the Brazilian pepper, *Schinus terebinthifolius,* which can irritate the skin in a manner akin to poison ivy.

**20.** Mosquito impoundments installed at that time consisted of mounds of land that were high and dry, surrounded by ditches that were constantly submerged by some level of water. *See* Tr. 475:21–23 (Melchiori). The creation of the contrasting mounds and ditches was intended to eliminate potential areas of reproduction for the salt-water mosquito, which lays its eggs only in marshy areas. *See* Tr. 471:21–25 (Melchiori).

There are at least ten to twelve mounds and multiple ditches on Plat 57. *See* Tr. 475:8–16 (Melchiori).

**21.** The "tour" Mr. Bayer spoke of refers to a tour taken by either Mr. Melchiori or Bill Kurr, Lost Tree's environmental consultant, in connection with the permit application for Plat 54. Tr. 234:3–8 (Bayer). To the extent Plat 57 has been taxed by the Indian River County Property Assessor, it has been assessed as "a separate parcel." Stip. ¶ 120.

the Cocoa Permit Section, Jacksonville Regulatory Division, U.S. Army Corps of Engineers) (When the 1980 Permit Application was submitted, "[i]t was apparent that Lost Tree did not intend to develop Plat 57 ... [because] there were no proposed fill impacts to that plat."). In early 2002, however, Lost Tree learned that a southerly property development, known as "The Estuary," located nearer the Lost Tree Islands than the John's Island community, had applied for a wetlands fill permit for its property and had proposed certain improvements to a mosquito control impoundment at McCuller's Point as proposed mitigation for that permit. Tr. 1403:11–22, 1404:23–25 (Melchiori). McCuller's Point is one of the islands in the Indian River and is located "approximately three-quarters of a mile south of Plat 57." Tr. 463:6–8 (Melchiori). Half of McCuller's Point was purchased by Lost Tree pursuant to the Option Agreement and half was purchased by The Estuary. Tr. 1402:24 to 1403:19 (Melchiori). Because Lost Tree owned half of McCuller's Point and thus was an abutting property owner, its consent was requested for the improvements. Tr. 1403:23–25 (Melchiori).

Initially, Lost Tree withheld its consent because "if [T]he [E]stuary were to improve [its] part of the impoundment, [it] would in effect improve Lost Tree's section of the impoundment, and therefore Lost Tree felt that if ... somebody is going to improve [its] land, [Lost Tree] should get the benefit, the permitting benefit out of that." Tr. 1410:6–12 (Melchiori); *see also* Tr. 1404:6–14 (Melchiori). That permitting benefit "would have been credits ... to [be] used for mitigation for a project." Tr. 1410:15–16 (Melchiori). At first, Lost Tree thought to create a mitigation bank, allowing mitigation credits to be used at a future time; however, "the mitigation bank was somewhat complicated, and [The Estuary] suggested that ... if [Lost Tree] had a site[-]specific project that [Lost Tree] could use the mitigation for, it would be easier to permit than a[ ] mitigation bank." Tr. 1404:15–19 (Melchiori); *see also*

Tr. 1410:22 to 1411:5 (Melchiori) (testifying that the St. John's River Water Management District also encouraged Lost Tree choose a site-specific project rather than use a mitigation bank).

At that point, Mr. Bayer and Mr. Melchiori "just kind of looked at property that was even remotely possible [to be developed] within John's Island." Tr. 1411:21–22 (Melchiori). Mr. Melchiori stated, "That's basically when [P]lat 57 came about, ... to utilize that mitigation or that impoundment's mitigation or benefit on a site-specific project, and the project, just looking for something, was [P]lat 57." Tr. 1411:12–15. Mr. Melchiori described how Lost Tree settled on Plat 57 as the proposed site to utilize the McCuller's Point mitigation credit:

> [Plat 57] was the only one that really had road access. There w[ere] a few other pieces, but for various reasons, most of which they didn't have access to roads, were kind of eliminated. And then looking at this one [Plat 57], and knowing that ... it had been impacted by ... previous mosquito control, it seemed like a logical site to use.

Tr. 1411:22 to 1412:4. Mr. Bayer then "estimated the potential sale price of Plat 57, based on opinions he obtained from real estate brokers and also considered estimates of costs to develop the parcel, which Mr. Bayer had asked Mr. Melchiori to prepare." Stip. ¶ 106; *see* PX 99 ("John's Island Plat 57 Construction Estimate" (Oct. 28, 2002)). The financial assessments showed that Plat 57 could be developed profitably; thereafter, Mr. Bayer recommended to Lost Tree that Plat 57 be developed for sale as one or more home sites. Stip. ¶ 107.[22]

"On August 2, 2002, Lost Tree filed an application with the Town of Indian River Shores requesting approval for a preliminary plat, as well as a marginal wetlands determination and conditional use authority for the Plat 57 property ..., seeking to fill 2.13 acres of wetlands." Stip. ¶ 110. Later that month, on August 23, 2002, Lost Tree sub-

---

22. In this vein, Mr. Bayer testified that property prices in the area of the community of John's Island were increasing rapidly during the time from 2001 through 2004, which potentially made

Plat 57 profitable despite the development costs that would be associated with the project. *See* Tr. 234:14 to 236:25.

mitted an application for a Section 404 wetlands fill permit from the Corps to fill Plat 57. *Id.* ¶ 111. "Most of the [proposed] mitigation for [P]lat 57 was ... to be done on ... the property that Lost Tree owned in McCuller[']s Point." Tr. 1412:11–19 (Melchiori). The Town of Indian River Shores approved a preliminary plat for Plat 57 allowing one residential home site, and such approval was conditioned on the Town's use of a portion of the mosquito control impoundment on McCuller's Point. Stip. ¶ 115. Lost Tree obtained "all other local approvals needed and all necessary approvals from the State to develop Plat 57 into a home[ ]site." *Id.* ¶ 117.[23]

On June 28, 2004, Lost Tree submitted additional information to the Corps in support of its application. Stip. ¶ 118. At that time, "the only property still owned by Lost Tree [within the community of John's Island], that was not platted or subject to or proposed for conservation consisted of a small number of scattered parcels on the Barrier Island, the Island of John's Island, and Gem Island," all of which "had significant obstacles to development," and the only platted property Lost Tree owned within the community of John's Island was Plat 55. Stip. ¶ 118.

The Corps denied the Plat 57 permit application on August 9, 2004, concluding that "less environmentally damaging alternatives were available to [Lost Tree] and the project purpose ha[d] already been realized through the development of home-sites within the subdivision." PX 114 (Plat 57 Denial Letter) at LTVC014016. In denying the permit, the Corps stated also that "[t]he Corps[ ] believes that the [Lost Tree Village Corporation] has had very reasonable use of its land at John's Island pursuant to prior DA authorizations." *Id.* at LTVC014038; *id.* ("It is clear the applicant has piecemealed his development and that reasonable use of the property has been achieved."). In arriving at this conclusion, the Corps pointed to "[p]revious permits issued to [Lost Tree Village Corp] and Horse[']s Head L[td.] includ[ing] the construction of causeways, excavation of canals and the placement of fill for the development of 4 single-family lots [on Plat 54]." [24] *Id.; see also* Tr. 941:18 to 942:15 (Sadowski) (confirming the Corps' belief that Lost Tree had enjoyed reasonable use of its land and its project had been completed based on development of the entirety of community of John's Island). Ms. Sadowski testified that if an applicant other than Lost Tree had sought the permit, it would have been granted. Tr. 955:5 to 956:16 (Sadowski).

## F. *Valuation of Plat 57*

Mr. Peter Armfield offered expert testimony on behalf of Lost Tree regarding the valuation of Plat 57. Mr. Armfield is a real estate appraiser and President of Armfield Wagner Appraisal & Research, Inc. in Vero Beach, Florida. Tr. 566:16–21. He has approximately 33 years of experience in real estate appraisal, Tr. 572:2, and he holds numerous certifications related to his work as an appraiser, Tr. 566:22 to 569:23. Approximately "99 percent" of his appraisals are performed in Indian River County, and prior to his involvement in this case he had appraised approximately three hundred and fifty properties within the community of John's Island. Tr. 570:22 to 571:2, 573:3–7. Using the appraisal standards set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP"), Tr. 575:23–25, Mr. Armfield concluded that the fair market value of Plat 57 as of August 9, 2004 had the permit been granted would have been $4,285,000, and its fair market value at that time without

---

**23.** The Town's approval was challenged in Florida circuit court by third parties on the grounds that the wetlands Lost Tree sought to fill were not marginal wetlands. Stip. ¶ 116. Lost Tree intervened in the suit as a third-party defendant, and after a three-day bench trial, in February 2004, the court upheld the Town's approvals for Plat 57, concluding that the town's ·determination that the wetlands were marginal was supported by substantial evidence. *Id.*

**24.** The Corps did not explain its reasoning to take account of the permit granted to Horse's Head for Plat 54 in the Plat 57 permit analysis, stating only that "Charles Bayer[,] the current president of [Lost Tree] is also the president of the Horse[']s Head L[td.]." PX 114 at LTVC014038.

the permit was $25,000. Tr. 580:24 to 581:7; *see* DX 134 (Mr. Armfield's Expert Report).[25]

The government submitted the expert testimony of Mr. John Underwood regarding valuation of Plat 57. Mr. Underwood is a real estate appraiser for Appraisal and Acquisition Consultants, Inc. in Lantana, Florida. He holds numerous licenses, Tr. 991:17–20, 992:8 to 993:12, and has 41 years of experience in appraisal, Tr. 995:8–25. He has conducted approximately 100 appraisals in Indian River County, Tr. 996:8–10, had made numerous appraisals in the community of John's Island during the 1970s, Tr. 996:25 to 997:9 (Mr. Underwood), and had completed over 1,000 wetlands appraisals, Tr. 997:18–20. Employing the USPAP standards, Mr. Underwood concluded that the fair market value of Plat 57 as of August 9, 2004 had the permit been granted would have been $3,910,000, and its fair market value at that time without the permit was $30,000. Tr. 1005:5–20; *see* DX 136 (Mr. Underwood's Expert Report). Mr. Underwood also appraised other parcels owned by Lost Tree and other entities. *See* DX 137; DX 138.

The government offered the expert testimony of Mr. Christopher Barry at trial as well. Mr. Barry is a partner at PricewaterhouseCoopers, where he has worked for approximately the past 27 years in a forensic services consulting practice. Tr. 1245:5–13, 1249:3–13. Mr. Barry's testimony focused on aggregating the value realized by Lost Tree from development of the John's Island Community with value realized by other companies in which Mrs. Stone or her daughters have a stake, such as Gem Island Investment, L.P., Horse's Head Ltd., and Lost Tree Preserve, LLC. Tr. 1258:6–8; *see* DX 139 at EXP000003 (Expert Report of Mr. Barry) (listing all companies considered in the analysis). Mr. Barry testified that assuming Plat 57 was worth $5.5 million, the economic impact of the loss of that profit would have constituted 3.6% of profits from the community of John's Island, Tr. 1305:20–

23, an "insignificant" number when considered with the aggregate revenues realized by Lost Tree and the aggregated companies as a result of development of the community of John's Island. Tr. 1342:10 to 1343:25.

## STANDARDS FOR DECISION

■ The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Takings cases generally fall into one of two categories: those accomplished by a physical invasion of the property or those that arise as a result of a regulatory imposition. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); *Lucas v. South Car. Coastal Council*, 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1365 (Fed.Cir.2004). Where the government takes physical possession of private property, it must compensate the owner, regardless of whether the property taken constituted the entire parcel or only a part. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *Bass Enters.*, 381 F.3d at 1365.

■ The law of regulatory takings is more intricate, and finds its genesis in Justice Holmes' familiar statement that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Since *Pennsylvania Coal*, the Supreme Court has provided an analytical framework for determining when a regulation "goes too far." A categorical duty to provide compensation to the owner who has suffered a regulatory taking only arises in the "extraordinary circumstance" where "*no* productive or economically beneficial use of land is permitted." *Lucas*, 505 U.S. at 1017, 112 S.Ct. 2886; *see also Tahoe–Sierra*,

---

**25.** Mr. Bayer offered his opinion in this regard as well, stating that if the permit had been granted to Lost Tree for Plat 57, he would have listed Plat 57 for $5.5 to $6 million, and he expected to sell it for approximately $5.2 million to $5.5 million. Tr. 260:4–12, 262:4–6. He testified also that Plat 57's value "as is" without the permit from the Corps was negative because it does not produce income and Lost Tree is required to pay real estate taxes on the property. Tr. 258:15–20.

535 U.S. at 330, 122 S.Ct. 1465. A property owner must suffer a literal total loss in value to trigger liability on the part of the government for a categorical taking. *See Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. 2886; *see also Tahoe–Sierra,* 535 U.S. at 330, 122 S.Ct. 1465 ("Anything less than a 'complete elimination of value,' or a 'total loss,'" does not fall within *Lucas*' scope).

■ If the regulation "fall[s] short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors." *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448. This analysis is an "essentially ad hoc, factual inquir[y]," in which the court considers particularly: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *see also Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448. While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo,* 533 U.S. at 634, 636, 121 S.Ct. 2448 (O'Connor, J., concurring); *see also Tahoe–Sierra,* 535 U.S. at 321, 122 S.Ct. 1465 (whether a taking has occurred "depends upon the particular circumstances of the case"); *Yee v. City of Escondido, Cal.,* 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (Regulatory takings claims "entail[ ] complex factual assessments.").

## ANALYSIS

A. *The Relevant–Parcel Determination*

1. *Factors to consider.*

As a threshold matter, the court must determine how to define the relevant parcel in this case. This question of the relevant parcel "is referred to as the denominator problem, because, in comparing the value that has been taken from the property by the imposition with the value that remains in the property, 'one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator

of the fraction.'" *Palm Beach Isles Assocs. v. United States,* 208 F.3d 1374, 1380 n. 4 (Fed.Cir.2000), *aff'd on reh'g,* 231 F.3d 1354 (Fed.Cir.2000). On this question, there is no bright-line rule; rather, the court takes "a flexible approach, designed to account for factual nuances." *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1181 (Fed.Cir. 1994); *see also Palm Beach Isles,* 208 F.3d at 1381.

■ In *Penn Central,* the Court indicated that the focus on the takings analysis must be the effect of the regulation on the "parcel as a whole":

"Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole.

438 U.S. at 130–31, 98 S.Ct. 2646; *see also Tahoe–Sierra,* 535 U.S. at 327, 122 S.Ct. 1465 ("*Penn Central* ... ma[d]e it clear that even though multiple factors are relevant in the analysis of regulatory takings claims, in such cases we must focus on 'the parcel as a whole.'"). Accordingly, a takings claimant may not "conceptually sever" the regulated portion of a parcel by simply "defining the property interest taken in terms of the very regulation being challenged." *Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. 1465. In this regard, the Supreme Court has explained, "[t]o the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken *is all,* or *only a portion of,* the parcel in question." *Concrete Pipe & Prod. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 644, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (emphasis added).

■ The relevant-parcel analysis focuses on, among other things, "the owner's actual and projected use of the property." *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1365 (Fed.Cir.1999); *see also Norman v. United States,* 429 F.3d 1081, 1091 (Fed.Cir.

2005); *Loveladies Harbor*, 28 F.3d at 1181; *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1172 (Fed.Cir.1991); *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 904 (Fed.Cir.1986). Relevant takings precedent has yielded a number of factors that bear on the inquiry, including: (1) the degree of contiguity between property interests, (2) the dates of acquisition of property interests, (3) the extent to which a parcel has been treated as a single income-producing unit, (4) the extent to which a common development scheme applied to the parcel, and (5) the extent to which the regulated lands enhance the value of the remaining lands. *See Palm Beach Isles*, 208 F.3d at 1381. The court previously also stated that a sixth factor, "(6) the extent [to which] any earlier development had reached completion and closure" was also a relevant consideration in the relevant-parcel analysis. *Lost Tree*, 92 Fed. Cl. at 718. Inclusion of that factor has engendered considerable debate between the parties in this case. Although the government concedes that temporality may be considered in relation to the imposition of the regulatory scheme, it claims that temporal considerations related to progression of development may not inform the court's analysis, and that severing a parcel on temporal grounds runs afoul of the Supreme Court's opinion in *Tahoe–Sierra*. *See* Cl. Tr. 36:25 to 37:10; Def.'s Post–Tr. Br. at 9 ("[T]he Supreme Court's opinion in *Tahoe–Sierra* … precludes temporal severance of the parcel as a whole."). Conversely, Lost Tree claims that "the Federal Circuit has twice directly held that property sold by the landowner prior to the regulatory imposition should be excluded from consideration in comparing the property value lost from that which the landowner retained." Pl.'s Post–Tr. Br. at 5 (citing *Loveladies Harbor*, 28 F.3d at 1181; *Palm Beach Isles*, 208 F.3d at 1380–81). Lost Tree contends that temporal consider-

ations "require exclusion from the relevant parcel in this case of all property that Lost Tree sold before attempting to develop Plat 57." Pl.'s Post–Tr. Br. at 5. Neither Lost Tree nor the government accurately capture the import of the cases upon which they rely.

In *Loveladies Harbor*, Loveladies had originally acquired a 250–acre tract of land, and by 1972, it had developed 199 acres of that land and sold all but 6.4 of those 199 acres. 28 F.3d at 1174, 1180. To develop the remaining 51 acres, Loveladies needed to fill 50 acres, one acre having been previously filled. *Id.* at 1174. Negotiations with the State of New Jersey yielded a compromise that allowed Loveladies to develop 12.5 acres, including the one acre previously filled, and required Loveladies to donate to the state the remaining 38.5 acres. *Id.* at 1174, 1180. The Corps rejected the fill permit for the 12.5 acre development. *Id.* at 1174.

In determining that the relevant parcel was the 12.5 acres, the Federal Circuit first excluded the 199 acres previously developed. 28 F.3d at 1181. In doing so, it considered "the timing of transfers in light of the developing regulatory environment," noting that the regulatory scheme was not imposed upon Loveladies until after the 199 acres had been developed and sold in substantial part. *Id.* The court additionally noted that the development of the 199 acres "occurred over a substantial period of years beginning in 1958, and involved many kinds of government permits." *Id.* The court also eliminated from the relevant parcel those 38.5 acres which had been promised to New Jersey "since whatever substantial value that land had now belongs to the state and not to Loveladies" and opining that it was inappropriate to count against Loveladies property donated to the state for the purposes of the takings analysis. *Id.* at 1181.[26]

---

26. In affirming the trial court's opinion, the Federal Circuit characterized the lower court decision as "conclud[ing] that land developed or sold before the regulatory environment existed should be included in the denominator." *Loveladies*, 28 F.3d at 1181. Notably, however, the trial court in *Loveladies* excluded the previously-sold 192.6 acres because "on the basis of *Keystone* [*Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)],

th[e] court cannot include the value of all of the property originally purchased as the parcel as a whole[; rather], th[e] court must limit its focus upon the value of that property which plaintiffs held when the taking was said to have occurred." *Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 381, 392 (1988); *see also Loveladies Harbor*, 28 F.3d at 1180 n. 13 (noting that *Keystone* described the regulatory takings analysis as requiring courts "to compare the value that has been

In *Palm Beach Isles*, a group of investors bought 311.7 acres of land in 1956. 208 F.3d at 1377. By 1968, all but 50.7 acres of the original 311.7 had been sold to another developer. *Id.* Palm Beach was denied a permit to fill the remaining 50.7 acres. *Id.* at 1378. In concluding that the relevant parcel was the 50.7 acres, the Federal Circuit noted that the 261 acres were sold prior to enactment of the Clean Water Act, which created the substantive regulatory regime under which the permit was denied. *Id.* at 1381. The court considered also the circumstance that "[t]he development of [the 261 acres] was physically and temporally remote from, and legally unconnected to, the 50.7 acres of wetlands," and stated that "[c]ombining the two tracts for purposes of the regulatory takings analysis involved here, simply because at one time they were under common ownership . . . cannot be justified." *Id.*

*Tahoe–Sierra* addressed temporality in a related, but analytically distinguishable, context. In *Tahoe–Sierra*, the petitioners claimed that a temporary 32–month moratorium on development of their property constituted a *Lucas*-style categorical taking because claimants were deprived of all economic use of their property for those 32 months. 535 U.S. at 331, 122 S.Ct. 1465. In rejecting petitioners' contention that the 32–month segment should be conceptually severed from the remainder of the owners' fee simple estate, the Court noted that "[a]n interest in real property is defined by the metes and bounds that describe its

geographic dimensions and the term of years that describes the temporal aspect of the owner's interest." *Id.* at 331–32, 122 S.Ct. 1465. In this regard, the Court stated, "[l]ogically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Id.* at 332, 122 S.Ct. 1465. Once petitioners' property interests were defined as their respective fee simple estates, the Court concluded that there was no taking because "a permanent deprivation of the owner's use of the entire area is a taking of 'the parcel as a whole,' whereas a temporary restriction that merely causes a diminution in value is not." *Id.* The Court did not adopt a *per se* rule against takings claims based on temporary moratoria, however. To the contrary, it stated explicitly, "[i]n our view[,] the answer to the abstract question whether a temporary moratorium effects a taking is neither 'yes, always' nor 'no, never'; the answer depends upon the particular circumstances of the case." 535 U.S. at 321, 122 S.Ct. 1465; *id.* at 337, 122 S.Ct. 1465 ("In rejecting petitioners' *per se* rule, we do not hold that the temporary nature of a land-use restriction precludes finding that it effects a taking; we simply recognize that it should not be given exclusive significance one way or the other.").[27]

Thus, while *Palm Beach Isles* and *Loveladies Harbor* considered whether previously-owned property by the claimant was disposed

---

taken from the property with the value that *remains in the property*") (emphasis added). The court excluded the 6.4 acres because those acres "had become sporadically held units of property, all of which were no longer contiguous with the 12.5 acres at issue." 15 Cl.Ct. at 392.

*Keystone Bituminous* indeed frames the takings analysis in a way that would appear to exclude previously-sold property. 480 U.S. at 497, 107 S.Ct. 1232 ("compare the value that has been taken from the property with the value that *remains in the property*") (emphasis added); *see also Palm Beach Isles*, 208 F.3d at 1380 n. 4 (describing the takings analysis as "comparing the value that has been taken from the property by the imposition with the value that remains in the property"). This formulation, however, has not been taken literally in some subsequent cases, where previously-sold property has been included in the takings denominator. *See, e.g.,*

*Norman*, 429 F.3d at 1087, 1091 (finding that the relevant parcel was a 2280–acre tract purchased by appellants where appellants owned only 716 acres of the 2280–acre tract when the permit was denied).

27. In *Tahoe–Sierra*, the majority of the Supreme Court rejected a suggestion by Chief Justice Rehnquist "that delays of six years or more should be treated as *per se* takings," 535 U.S. at 338 n. 34, 122 S.Ct. 1465, opining that the "temptation to adopt what amount to *per se* rules in either direction must be resisted." *Id.* at 342, 122 S.Ct. 1465 (quoting *Palazzolo*, 533 U.S. at 636, 121 S.Ct. 2448 (O'Connor, J., concurring)). The majority observed, however, that "[i]t may well be true that any moratorium that lasts for more than one year should be viewed with special skepticism." *Id.* at 341, 122 S.Ct. 1465.

of prior to implementation of the pertinent regulatory scheme, both cases looked also to the nature of development and prior dispositions of property to determine the relationship between the properties that had been sold, donated, or otherwise transferred and the regulated parcel. *See Palm Beach Isles,* 208 F.3d at 1381; *Loveladies Harbor,* 28 F.3d at 1181; *see also Walcek v. United States,* 49 Fed.Cl. 248, 260 (2001), *aff'd,* 303 F.3d 1349 (Fed.Cir.2002) (summarizing *Palm Beach* and stating that in *Palm Beach,* the Federal Circuit "heavily relied on the fact that all but 50.7 acres had been sold by the plaintiff in 1968, long before the development in question was proposed"). Neither *Palm Beach Isles* nor *Loveladies Harbor,* however, articulated a categorical rule that the court must exclude previously-sold property from the parcel as a whole. In short, facts regarding the progression and status of development plus sale of potentially-related properties are aspects of property ownership that reflect manifestations of a property owner's use and projected use of property. If the particular circumstances and realities of usage indicate that temporal considerations are salient, then temporality has to be taken into account in determining the "parcel as a whole." [28]

### 2. *Application of factors.*

■ Lost Tree contends that "Plat 57 should be considered alone as the relevant parcel" for the takings analysis. Pl.'s Post–Tr. Br. at 3. This is so, Lost Tree avers, because it did not have any overall development plan for the property purchased under the 1968 Option Agreement or for the community of John's Island, *id.* at 7, and as of 1995, Lost Tree had sold virtually all developable property in the community of John's Island, *id.* at 9. In this vein, Lost Tree argues that Plat 57 is commercially unconnected to and divorced from any property that Lost Tree has owned or owns now. *Id.* at 10.

The government argues that the entire community of John's Island is the relevant denominator in this case. Def.'s Post–Tr. Br. at 5. In this connection, the government points to the circumstances that Plat 57 was acquired with the rest of the community of John's Island under the Option Agreement, *id.* at 12, and that Plat 57 is within the physical boundaries of the community, *id.* at 11. The government maintains that Lost Tree has treated Plat 57 as part of the single economic unit of the community of John's Island, *id.* at 14, and that Lost Tree's plans for the community included Plat 57, *id.* at 19. Alternatively, the government avers that, at a minimum, the parcel as a whole includes either (1) the Island of John's Island and Gem Island, *id.* at 29, or (2) all property within the community of John's Island at the time of Lost Tree's "[c]orporate [r]eorganization" in 1995, *id.* at 30, or (3) all property within the community of John's Island owned by Lost Tree at the time of the Plat 57 permit application, *id.* at 31.

Plat 57 indeed lies within the physical boundaries of the community of John's Island. Stip. ¶ 133. And it was purchased under the 1968 Option Agreement, along with the approximately 1,300 acres that ultimately became part of—but not the entirety of—the community of John's Island. *Id.* ¶ 14. The government contends that these facts are sufficient to establish the parcel as a whole as the entire community of John's Island. *See* Def.'s Post–Tr. Br. at 12, 14. The contiguous nature of Plat 57 to other developed properties within the community of John's Island, and the bulk purchase of the properties constituting a substantial part of the community of John's Island are important considerations. *See Ciampitti v. United States,* 22 Cl.Ct. 310, 320 (1991) (relevant parcel included more than regulated property where claimant treated regulated property plus other lands as "a single parcel for pur-

---

**28.** Quite simply, there are very few *per se* rules in regulatory takings cases. *See Tahoe–Sierra,* 535 U.S. at 322, 122 S.Ct. 1465 ("Our jurisprudence involving condemnations and physical takings ... for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, ... is charac-

terized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances.' ") (citations omitted); *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448 ("The temptation to adopt what amount to *per se* rules in either direction must be resisted.") (O'Connor, J., concurring).

poses of purchase and financing"). Nevertheless, these factors are just several among many, and neither factor is necessarily dispositive. *See Palm Beach Isles,* 208 F.3d at 1377 (relevant parcel was 50.7 acre property despite being purchased along with 261 acres in one transaction); *Cane Tenn., Inc. v. United States,* 60 Fed.Cl. 694, 703 (2004) ("[C]ontiguity is just one factor in the parcel-as-a-whole analysis."); *Ciampitti,* 22 Cl.Ct. at 320 (relevant parcel included noncontiguous property).

The government further contends that "Lost Tree proceeded with a development scheme aimed at developing the [c]ommunity of John's Island as a single integrated community." Def.'s Post–Tr. Br. at 14–15. The evidence adduced at trial, however, does not support the government's position. As noted, although the 1968 Option Agreement called for a development plan, no plan such as the one envisioned by the Agreement nor any plan for developing the whole community has ever been found. Stip. ¶ 17. In light of Lost Tree's significant and ultimately unsuccessful efforts in the 1990s towards finding a development plan, the court is persuaded that no such plan has ever existed.

The government would supplant the lack of an overall master plan for the community of John's Island by reliance on the 1980 Development Plan. Def.'s Post–Tr. Br. at 20–24. However, the government's contention that the 1980 Development Plan serves as a master scheme of development tying Plat 57 to the entire community of John's Island overlooks crucial facts. The 1980 Plan explicitly covered only the Island of John's Island and Gem Island—not the entire community of John's Island. *See* PX 33 (1980 Development Plan). Thus, to the extent the 1980 Development Plan ties Plat 57 to other properties it cannot bind it to the entire community of John's Island. Furthermore, the community of John's Island encompasses parcels which were neither covered by the 1968 Option Agreement nor ever owned by Lost Tree. Stip. ¶¶ 19–20.

What is more, the 1980 Permit Application was not approved and was superseded by a revised, scaled-back development proposal that led to the ultimate grant of the 1982 Permit. The area that much later became Plat 57 was simply not addressed by the revised proposal that was granted. In this connection, a technical staff report created by Mr. Mark Gronceski, senior scientist for the St. John's River Water Management District, recounted the permitting history of John's Island and stated:

> It is clear from the DER file that many of the 'wildlife preserve' areas so labeled on early drawings were originally proposed to be formally preserved via an easement as mitigation for the totality of impacts initially proposed, but were dropped when the proposed impacts were greatly reduced by deletion of the three canals and the 'tidal ponds' from the DER application and permit.

PX 85 at LTVC003008 (Facsimile entitled "Lost Tree Village Permitting History" from Mr. Gronceski to Mr. Melchiori (July 13, 1998)). Ms. Sadowski concurred, stating that because Plat 57 was not shown as a wildlife preserve on the permit ultimately granted to Lost Tree, Plat 57 was no longer proposed as mitigation for that permit. Tr. 934:11–24 (Sadowski). Mr. Melchiori testified to the same effect, stating that once the revised proposal replaced the 1980 Permit Application, the Plat 54 and Plat 57 properties "no longer had th[e] designation [of wildlife preserves for mitigation]." Tr. 408:2–7 (Melchiori).

The government responds that many proposed features of the 1980 Permit Application are present in the community of John's Island today, including the causeway from the Island of John's Island to the Barrier Island, certain roads, and the preservation of certain areas as wildlife preserves. *See* Def.'s Post–Tr. Br. at 23. Nonetheless, development on Gem Island and the Island of John's Island proceeded piecemeal in a manner that diverged in significant ways from the 1980 Application. *See* Stip. ¶ 69; Tr. 398:1–7 (Melchiori). Some proposed roads and canals in the 1980 Development Plan were built at different locations, some canals were never built at all, and some lots were configured differently than those proposed in the 1980 Application, the 1982 Permit, and a permit issued in 1983. *See* Stip. ¶ 69; Tr.

398:8 to 402:9 (Melchiori) (reciting examples of deviations from the 1980 Development Plan).

Evidence is also lacking that any informal development plan of which Plat 57 was a part has ever existed. The development of the property purchased by Lost Tree pursuant to the 1968 Option Agreement is best characterized as being one of opportunistic progression. *See* Tr. 90:2–5 (Bayer) ("[T]he property was developed sort of plat[ ] by plat[ ] by plat, and each development where [Lost Tree] built a road, filled lots, graded them, and built houses, was done on a step-by-step basis."); Tr. 785:12–16 (Stone) (testifying as to Lost Tree's fluid development intentions for John's Island). It occurred over approximately thirteen years, or, under the government's view, a longer period of time, and involved multiple distinct plat recordings and government permits. *Cf. Loveladies*, 28 F.3d at 1181 (noting that development of 199 acres originally purchased with regulated property but excluded from the relevant parcel "occurred over a substantial period of years beginning in 1958, and involved many kinds of government permits").

Reference to cases in which development plans tied the regulated property to a larger parcel is instructive. For example, in *Norman*, the Federal Circuit concluded that the parcel as a whole included the entire 2280–acre parcel originally purchased by appellants, not a 470–acre portion, where "appellants' own permit application related to the entire 2280–acre parcel, and not any subdivision thereof." 429 F.3d at 1091 n. 4. In that case, however, the challenged permit came about as "a result of a negotiations process between the Corps and plaintiffs, in which the parties discussed which areas of property on the 2280–acre Development could be utilized as mitigation wetlands." *Id.* at 1086 (internal quotation marks omitted).[29]

In *Forest Properties*, appellants applied for a Section 404 permit for the fill of 9.4 acres. 177 F.3d at 1363. The permit application proposed the creation of "a residential subdivision that [would] contain waterfront lots and a small marina," and stated "[a] total of 62 acres (9 acres of filled area) will be developed with approximately 100 lots." *Id.* After the Corps indicated it would not approve the permit, the application was revised to require fill of only 4.4 acres of land, but the permit was still denied. *Id.* As in *Norman*, the Federal Circuit concluded that the relevant parcel for the takings analysis was the entire 62 acres, not, as appellants urged, the 9.4 acres proposed to be filled in the original application, because the permit applications explicitly demonstrated that the 62 acres were considered "a single integrated project." *Id.* at 1365.

Similarly, in *Deltona Corp. v. United States*, 657 F.2d 1184 (Ct.Cl.1981), plaintiff purchased a 10,000 acre parcel and created a "master plan [which] called for more than 12,000 single family tracts, numerous multifamily sites, school and park areas, shopping districts, marinas, beaches[,] and regular utilities," with the community to be called Marco Island. 657 F.2d at 1188. The plaintiff also divided Marco Island into five permit areas to be built consecutively, with each stage projected to take three to four years to complete. *Id.* Although the parcel-as-a-whole issue did not receive significant attention, the Court of Claims defined the relevant parcel as the entire 10,000 acre parcel. *Id.* at 1193.

Far from the development plan evidenced by the *Norman* plaintiffs in their 2280–acre permit application and their ensuing negotiations with the Corps, and from the explicit master plans at issue in *Forest Properties* and *Deltona*, there exists in this case no master plan of development for the community of John's Island. Furthermore, subsequent to the superseding revision of the 1980 Permit Application, Plat 57 was never tied explicitly or implicitly to any subsequent permit nor was the community of John's Island tied to the Plat 57 permit application.

---

29. In *Norman*, appellants argued that because they bought a parcel of land in 1988 in reliance upon a favorable delineation demarcating jurisdictional wetlands by the Corps, a subsequent and less favorable re-delineation in 1991 culminated in a taking of the portion of appellants' property that they were required to dedicate in order to receive a development permit in 1999. 429 F.3d at 1088. Although appellants expressly disavowed a challenge to the 1999 permit itself, the court addressed the possibility that the 1999 permit effected a taking. *Id.*

Evidence regarding Lost Tree's intended usage of Plat 57, or lack of any projected usage, subsequent to the issuance of the 1982 Permit is equally telling. In 1985, development of Stingaree Point went forward, with utilities being "stubbed out" to all then-platted lots and to the then-unplatted area of Plat 55. Lost Tree's failure to "stub out" utilities to the property constituting Plat 57 at that time demonstrates the lack of any plan to include Plat 57 in the progressive development of the Island of John's Island. *See also* PX 56 at LTVC013533 (1986 Appraisal) (noting that "Stingaree Point development is substantially completed," with few exceptions of which Plat 57 was not a part). It is apparent that after 1982 and until at least 1994, Plat 57 was ignored entirely as development of the community of John's Island came to a close. As of 1994, when most knowledgeable people considered development of the community of John's Island to have been completed, the property constituting Plat 57 had not been platted, utilities had not been extended to it, nor had it been dedicated to any use such as mitigation for a project on other plats.

When Mr. Melchiori included the Plat 57 property on the 1995 List taking inventory of Lost Tree's residual properties, Lost Tree became aware of its ownership of that land. At that time, however, Lost Tree did nothing with the property. Instead, Lost Tree left Plat 57 untouched for the next seven years, until The Estuary notified Lost Tree in 2002 of its intentions to develop a part of McCuller's Point. Even at that time, Lost Tree did not immediately consider Plat 57 for development. Rather, as Mr. Bayer and Mr. Melchiori testified, Lost Tree surveyed the remaining residual properties it owned, and settled on Plat 57, due in large part to the fact that Plat 57 had been subject to trenched and mounded mosquito control impoundments and was immediately adjacent to a road.

Lost Tree's treatment of Plat 57 and the adventitious nature of Plat 57's development is inconsistent with the contention that an overall development of which Plat 57 was a part existed for the community of John's Island. It also reveals that Lost Tree's be-lated decision to develop Plat 57 was not part of its planned "actual [or] projected use" of the property constituting the community of John's Island, *Forest Properties,* 177 F.3d at 1365, nor did Lost Tree's development of the community, which had concluded no later than seven years prior to the recording of Plat 57, dictate the decision to develop Plat 57. As in *Palm Beach Isles,* here, the development of the community of John's Island was "physically and temporally remote from" Plat 57. 208 F.3d at 1381.

In short, the evidence does not support the finding that Lost Tree treated Plat 57 together with the entire community of John's Island as "a single income-producing unit," nor does it support the conclusion that any overarching development scheme applied to Plat 57. Focusing on Lost Tree's actual use of the property, the court finds that the parcel as a whole cannot be defined as the entire community of John's Island. Having concluded this much, the court must now determine if the parcel as a whole nonetheless includes other property besides Plat 57.

The evidence adduced at trial makes plain that in 1994 Lost Tree changed the direction of its operations to focus on investment in commercial properties. Attendant to that changed business purpose it endeavored to dispose of all of its residual real estate holdings, inside and outside the community of John's Island. Lost Tree accordingly sold Plat 52 in 1995 and put the North Acreage and the West Acreage on the market that same year. In 1997, Lost Tree sold Plat 54 to Horse's Head Ltd., along with Hole–in–the–Wall Island and other residual properties that might be placed in conservation easements to support development of Plat 54. In 1999, Lost Tree submitted an application to the Town of Indian River Shores for a plat on a portion of the Lost Tree Islands, separated from and some distance to the south of the John's Island community. The denial of that application ultimately led to the 2003 disposition of those Islands. In 1999, the North Acreage property was sold. Thus, as of the 2002 submission of the permit application for Plat 57, Lost Tree held only the West Acreage, lying well outside of the community of John's Island, and Plat 55, Plat 57,

and scattered unusable wetland parcels within the community. The government does not contest the exclusion of the West Acreage from any parcel-as-a-whole determination for Plat 57. *See* Def.'s Post–Tr. Br. at 5, 29–31 (proffering four potential relevant-parcel configurations, all of which exclude the West Acreage as well as the North Acreage, which was sold in 1999). The West and North acreages are well removed from the John's Island community and never were associated with the community. The parties consequently have focused on Plat 55 and the relatively small and scattered residual wetlands.

Lost Tree avers that Plat 55 should be excluded from consideration because it is a distinct parcel, separated by a 323–foot strip of land from Plat 57, and because Plat 55 was developed years before Plat 57 was projected. Pl.'s Post–Tr. Reply Br. at 9. Lost Tree contends also that the two properties are distinct because Lost Tree has different usage objectives for each, with Plat 55 being held for "asset planning" or "investment," instead of sale. *Id.*

Plat 55 and 57 are indeed two separate parcels, recorded at different times, with a 323–foot strip of land lying between them. However, Lost Tree owned at the time of the permit application, and owns at the present time, that 323–foot strip of land. *See* Pl.'s Post–Tr. Br. at 9 ("[A]fter those sales [of Plat 52 and Plat 54], the only property Lost Tree owned inside the John's Island community, apart from a few very small, *de minimis* pieces, was ... Plat 57, Plat 55 and a handful of scattered and unusable wetland and/or mangrove covered parcels, including the very narrow foot strip of land between plat 57 and 55."); Tr. 1413:6–12 (Melchiori) (affirming that the 323–foot strip of land is owned by Lost Tree today). Thus, while the plats are distinct legal parcels, they are undoubtedly contiguous.

Moreover, the court finds unpersuasive Lost Tree's contention that the two properties are currently held for distinct usage objectives. Mr. Armfield stated that he conducted an appraisal of potential remainder estates in Plat 55 in October 2001 because the Stone family was "making decisions about asset planning." Tr. 648:13–14. Nevertheless, Mr. Bayer testified in unequivocal terms that Plat 55 was retained by Lost Tree due to its potential for increasing property values and the absence of a financially satisfactory offer for the property. Tr. 135:3 to 136:11. He stated also that the Plat had been listed for sale some years after its recording, Tr. 136:2–3, thus belying the contention that Lost Tree does not intend to sell Plat 55. The usage objectives of Plat 55 and Plat 57 thus are comparable: Lost Tree hopes to sell for profit the lots on Plat 55 just as it did the projected lot on Plat 57.

On this issue, the court finds guidance as well from the seminal case of *Penn Central*. The facts of that case are familiar but deserve a brief recitation. In *Penn Central*, the petitioner owned several properties in an area of midtown Manhattan, including Grand Central Terminal. 438 U.S. at 115, 98 S.Ct. 2646. The State of New York designated the Terminal a "landmark," and the "city tax block" it occupies a "landmark site." *Id.* at 115–16, 98 S.Ct. 2646. That designation ultimately prevented petitioner from receiving New York City's approval to develop an office building on the Terminal. *Id.* at 117–18, 98 S.Ct. 2646. Petitioners were permitted, however, under the New York zoning laws, to transfer development rights to other parcels meeting certain geographic qualifications (such as location on the same city block, across the street, or nearby), and to transfer all unused development rights to any one of those parcels. *Id.* at 113–15, 98 S.Ct. 2646. The Supreme Court denied petitioners' taking claim. 438 U.S. at 138, 98 S.Ct. 2646. The Court found that the relevant parcel included not just petitioners' property interest in the air rights above the Terminal; rather, it consisted of the "city tax block" designated as the landmark site. *Id.* at 131, 98 S.Ct. 2646. And, in considering whether petitioners had been denied all economically viable use of their property rights, the court found persuasive the fact that petitioner's air rights were "made transferable to at least eight parcels in the vicinity of the Terminal." *Id.* at 137, 98 S.Ct. 2646.

This particular aspect of the Court's analysis in *Penn Central* has since been the sub-

ject of considerable discussion in later Supreme Court cases. For example, in *Lucas,* the Court opined on the denominator problem, noting that the precedents surrounding the parcel-as-a-whole rule were murky at best. 505 U.S. at 1016 n. 7, 112 S.Ct. 2886. In this regard, the Court mentioned as an example the state court's definition of the parcel as a whole in *Penn Central* as "the takings claimant's other holdings in the vicinity," criticizing that formulation as "an extreme ... and ... unsupportable ... view." *Id.; see also Palazzolo,* 533 U.S. at 631, 121 S.Ct. 2448 (noting that the Court in *Lucas* had expressed discomfort with some applications of the parcel-as-a-whole rule). These observations about *Penn Central* echo the tension in the *Penn Central* decision itself between the definition of the relevant parcel as being the "city tax block" and the subsequent statement that the transferability of Penn Central's air rights to "at least eight parcels in the vicinity of the Terminal ... [is] to be taken into account in considering the impact of regulation." 438 U.S. at 137, 98 S.Ct. 2646.

Some clarification to the Court's approach to the relevant parcel in *Penn Central* was made in *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 749, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), by Justice Scalia in a concurring opinion. In distinguishing *Penn Central* from the case then before the Court, Justice Scalia stated that the transferable development rights were considered in *Penn Central* because the petitioners were "landowners who owned at least eight nearby parcels, some immediately adjacent to the terminal, that could be benefitted by the [transferable development rights]." *Id.* Thus, "[t]he relevant land, it could be said, was the aggregation of the owners' parcels subject to the regulation (or at least the contiguous parcels); and the use of that land, as a whole, had not been diminished." *Id.*

*Penn Central's* treatment of the parcel-as-a-whole issue and its consideration of properties owned by Penn Central in the vicinity of the Terminal favor inclusion of Plat 55 and

the remaining scattered wetlands in the relevant parcel. Accordingly, the court finds that the parcel as a whole in this case is Plat 55 and Plat 57, plus those scattered wetlands still owned by Lost Tree within the community of John's Island.

B. *Application of* Penn Central *Factors*

1. *Economic impact of the regulation on the claimant's property.*

  a. *Aggregation of entities.*

■ The government suggests that in calculating the economic impact of the denial of the Plat 57 permit application, the court should aggregate Lost Tree's profits realized from its ventures developing the property purchased under the 1968 Option Agreement and those profits realized by what the government labels Lost Tree's eight "affiliated companies." Def.'s Post-Tr. Br. at 43.[30] It contends that "no other method could adequately convey the true value of the John's Island enterprise." *Id.* at 43 n. 10. To that end, the government presented at trial the testimony of Mr. Barry, a forensic accountant, who determined that the sale value of Plat 57 as permitted would constitute 3.6% of profits from the community of John's Island, when such profits are defined as encompassing those realized by companies such as Horse's Head Ltd., Gem Island Investment, and Lost Tree Preserve. Tr. 1305:20–23, 1342:10 to 1343:12 (Barry); *see* DX 139 (Mr. Barry's Expert Report).

Mr. Barry testified that he aggregated the companies based on an explicit instruction he received from the government to do so. Tr. 1300:5. He opined that the instruction was supported in his mind by his familiarity "with the fact of how real estate development companies tend to set up affiliated entities to do various aspects of the development and marketing," Tr. 1278:7–10, and "the logic of the fact that these other entities were carrying out some of the development and selling activity on behalf of the option land," Tr.

---

**30.** Those eights companies are: Lost Tree Village Corporation, John's Island Real Estate Company, John's Island Inc., Lost Tree Real Estate Company, Gem Island Investment L.P., Island House Land Lease, Golf Club Investment L.P., and Horse's Head Ltd. DX 139 at EXP000003. Several of those companies had no relationship to the John's Island community.

1300:6–8.[31] Mr. Barry contended that the decision to aggregate was based also on the common control of each of these entities based on ownership by a member of the Ecclestone or Stone family. Tr. 1288:5–11. At trial, although Lost Tree objected to Mr. Barry's testimony, the court accepted Mr. Barry as an expert in forensic accounting but did not accept Mr. Barry as an expert on aggregation or consolidation of businesses. *See* Tr. 1304:1–6.

In *Cane*, the court faced a similar contention by the government that property held by legally distinct entities should be aggregated for purposes of the relevant-parcel and economic-impact analyses. In that case, three individual plaintiffs and three trusts for the benefit of those plaintiffs brought jointly a takings claim for property interests that they had received in a series of donative transfers from the parents of the individual plaintiffs. 60 Fed.Cl. at 696, 700. The government argued that aggregation of the various interests owned by all of the plaintiffs, both individuals and trusts, was proper and that the relevant parcel for the takings analysis was the entirety of the property interests that were acquired from the individual plaintiffs' parents in the county in which the alleged taking occurred. *Id.* at 700. The court disagreed, finding that the various property interests had not been treated as a single economic unit by the plaintiffs. *Id.* at 700 (citing *Forest Props.*, 177 F.3d at 1365). The court relied also on the fact that the interests were acquired by the individuals and the trusts decades apart, that they were separate legal entities, and that legal title to property interests held in trust resided in the trustee, not the beneficiaries. *Id.* at 700–01.

As in *Cane*, the properties which the government seeks to aggregate in this case are distinct legal entities, with substantially differing ownership interests. The companies were created at different times throughout four decades, and acquired their ownership interests in portions of the community of John's Island in varying degrees at separate periods. What is more, the ownership interests in many of the companies are principally held by Mrs. Stone's two daughters, not Mrs. Stone.

Upon even cursory consideration, the artificiality of such aggregation is apparent. To capture accurately the total profits yielded by the development of the community of John's Island, one would have to look to land owned by other entities unassociated with the Stone or Ecclestone family. *See* Tr. 1301:25 to 1302:3, 1303:13–18 (Barry); Stip. ¶¶ 19–20 (The community of John's Island encompasses parcels not covered by the 1968 Option Agreement nor ever owned by Lost Tree Village Corporation.). Mr. Barry admitted this much, stating "[i]f you're trying to get at the entirety of the profit in respect to developing John's Island, you would include even entities that aren't under the same control I suppose, but for our purposes we tried to limit the companies ... to just ones that seem to be under the common control of the Ecclestone/Stone family." Tr. 1301:25 to 1302:7. Mr. Barry's decision to circumscribe the analysis to only those companies which were "under the common control of the Ecclestone/Stone family," finds its basis not in the facts of this case but rather only in a direction from the government.

The Federal Circuit has held that if a "developer treats legally separate parcels as a single economic unit, [then] together they may constitute the relevant parcel." *Forest Props.*, 177 F.3d at 1365. This is hardly the same, however, as aggregating separate parcels owned by legally separate entities (none of whom are plaintiffs to this suit) to determine the economic impact of an alleged taking under the third factor of *Penn Central*. Unsurprisingly, the government has cited no precedent holding that profits realized by separate legal entities should be aggregated with those realized by the actual takings claimant to determine the economic impact of a taking. In short, the court rejects any aggregation of Lost Tree with other companies in which Mrs. Stone or her daughters have or have had an ownership interest.

---

31. Mr. Barry first stated that it was his understanding that all eight companies participated in developing or marketing the land acquired from the option agreement. Tr. 1277:11–15. He later revised his answer stating that perhaps Lost Tree Real Estate Company did not, but "it's a minor ... part of the aggregate numbers." 1277:15–18.

### b. The impact of the Plat 57 permit denial on Lost Tree.

▌ Lost Tree did not provide at trial any evidence recounting the economic impact of the permit denial for Plat 57 when the relevant parcel is defined as including more than Plat 57 itself. *See* DX 134 (Mr. Armfield's Expert Report) (appraising only Plat 57). Lost Tree bears the burden of establishing a regulatory taking, and in the absence of any evidence regarding economic impact, it manifestly would fail to meet that burden. *Forest Props.*, 177 F.3d at 1367. However, the government submitted an appraisal by Mr. Underwood of the residual properties owned by Lost Tree Village at the time of the permit application for Plat 57 on the Island of John's Island and Gem Island. *See* DX 137 ("An Appraisal of Residual Properties Owned by Lost Tree Village at the Time of Permit Application for Plat 57 on the Island of John's Island and Gem Island"). Mr. Underwood's appraisal accordingly will be applied in determining economic impact.

Mr. Underwood included in his appraisal the value of the lots on Plat 54, which had been sold to Horse's Head Ltd. prior to the time of the Plat 57 application. *See* DX 137 at EXP000169.[32] Because Mr. Underwood provided a disaggregated valuation for each individual parcel, the court may nonetheless use Mr. Underwood's appraisal to determine the economic impact of the denial of the Plat 57 permit on the property the court has identified as the parcel as a whole. After subtracting the property values representing Plat 54 from Mr. Underwood's calculations, the court finds that the imposition of the regulations here diminished the value of Lost Tree's property by approximately 58.4%.[33] This degree of diminution plainly does not constitute the type of total economic wipeout that constitutes a categorical taking under *Lucas*.

A partial taking may be compensable under *Penn Central*, but not all diminutions in value constitute partial regulatory takings. *See generally Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir. 1994) (discussing diminutions in value versus partial regulatory takings). The line dividing the two is unfixed, and on balance, similar reductions in property value might lead to disparate outcomes. *See Lucas*, 505 U.S. at 1019 n. 8, 112 S.Ct. 2886. This case, however, does not require splitting hairs. A diminution in value of 58.4%, while not insignificant, ordinarily falls short of a compensable taking under Supreme Court and Federal Circuit precedent. *See, e.g., Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. 2264 (46% diminution not a taking); *Jentgen v. United States*, 657 F.2d 1210, 1213 (Ct.Cl.1981) (approximately 50% diminution not a taking); *Ciampitti*, 22 Cl.Ct. at 320 n. 5 (25% diminution not a taking); *see also Arctic King Fisheries, Inc. v. United States*, 59 Fed.Cl. 360, 385 (2004) ("[I]t stretches the concept of partial taking too far to say that a diminution on the order of 50 percent or less has the effect of a taking.").

### 2. Reasonable investment-backed expectations.

Under *Penn Central*, the court considers as well the extent to which the regulatory restriction interfered with Lost Tree's reasonable investment-backed expectations. 438 U.S. at 124, 98 S.Ct. 2646; *see also Forest Props.*, 177 F.3d at 1367. Although "the regulatory regime in place at the time the claimant acquires the property at issue

---

**32.** At the time of the Plat 57 Permit Application, Horse's Head Ltd. owned one of the Plat 54 lots, Gem Island Investment L.P. owned a second, and the third was owned by a company called BW Palm Road, Inc. DX 137 at EXP000154–55. In his appraisal, Mr. Underwood stated that "[t]he larger parcel is based on a legal instruction. Two of the lots in Plat 54 are owned by related companies; the third lot is owned by an individual [sic]." *Id.* at EXP000169.

**33.** The total value of Plat 54 is listed as $10,230,000 in Mr. Underwood's report. *See* DX 137 at EXP000206. When that value is subtracted from the total value of Lost Tree's residual parcels, the value drops to $2,755,000. *See id.* at EXP000208. Eliminating also the appropriate taxes, commissions, and expenses associated with Plat 54, as well as unjustified entrepreneurial incentives, the total retrospective market value of the relevant parcel "as is" as of August 9, 2004 was $2,388,990. The total value of the parcel had the permit been granted on August 9, 2004 was $5,749,590. This represents a diminution in value of 58.4%.

helps to shape the reasonableness of those expectations," *Palazzolo,* 533 U.S. at 633, 121 S.Ct. 2448 (O'Connor, J., concurring), takings claims are "not barred by the mere fact that ... title was acquired after the effective date of the state-imposed restriction," *id.* at 630, 121 S.Ct. 2448 (majority op.). *See also Palm Beach Isles,* 231 F.3d at 1364 ("The existence of a regulatory regime does not per se preclude all investment-backed expectations for development.").

The government avers that under Lost Tree's own recitation of the facts, it had "no intention or expectation that Plat 57 would be developed as a residential homesite," and as of 2001 or 2002, those expectations "could not have been reasonable, [because] the regulatory scheme at that time was well-settled." Def.'s Post–Tr. Br. at 39 (emphasis omitted). Lost Tree responds that it had "inchoate expectations for all the property it purchased and paid for under the 1968 Option Agreement," but did not develop "distinct economic expectations for Plat 57" until 2001. Pl.'s Post–Tr. Reply Br. at 13–14 (emphasis omitted).

Lost Tree arguably possessed expectations for Plat 57 beginning in 2001 or 2002; however, those expectations were subject to the regulatory regime then in place. Lost Tree's expectations were not objectively unreasonable given the adventitious projected development at McCuller's Point by The Estuary, coupled with the facts that Lost Tree had property on the Point that was readily available for wetland improvement, *i.e.,* removal of a previously installed mosquito control project, and the State supported the project.

### 3. *Character of the government action.*

Third, and finally, the court looks to the character of the government action, *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646, exam-

ining "the purpose of the regulation and its desired effects," *Bass Enters.,* 381 F.3d at 1370. *See also Maritrans Inc. v. United States,* 342 F.3d 1344, 1356 (Fed.Cir.2003) ("The character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition."). In *Eastern Enterprises v. Apfel,* 524 U.S. 498, 537, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), the Supreme Court suggested that in considering the character of the government action, the court look also to the extent to which the action is retroactive and whether the action targets a particular individual.[34]

The government action at issue in this case occurred under the Clean Water Act, the goal of which is to "restore and maintain the chemical, physical and biological integrity of the [n]ation's waters." 33 U.S.C. § 1251(a). The Federal Circuit and this court have confirmed that the Clean Water Act and its stated goal of preserving the nation's waterways and wetlands is a legitimate governmental objective tied to the public welfare. *See Florida Rock Indus.,* 791 F.2d at 904 ("[T]he preservation of wetlands bears a substantial relationship to the public welfare."); *Brace v. United States,* 48 Fed.Cl. 272, 279 (2000) ("[T]he United States has a legitimate public welfare obligation to preserve our nation's wetlands.").

The Corps' denial, however, was targeted to Lost Tree. If an individual or small developer other than Lost Tree had pursued a fill permit for Plat 57, the Corps conceded that they would have received far different treatment than Lost Tree. *See* Tr. 955:5 to 956:16 (Sadowski). Notwithstanding the broad application of the Clean Water Act, the Corps' denial in this instance in effect singled out Lost Tree for adverse treatment. Addi-

---

**34.** In *Palazzolo,* the Supreme Court mentioned that the legitimacy of the public interest might be a consideration. *See* 533 U.S. at 633–34, 121 S.Ct. 2448 ("[A] use restriction on real property may constitute a taking if not reasonably necessary to the effectuation of a substantial public purpose.") (internal quotations omitted) (quoting *Penn Central,* 438 U.S. at 127, 98 S.Ct. 2646). Subsequently, however, the Supreme Court appears not to have followed upon that commentary, at least where the public purpose is not at issue. *Compare Tahoe–Sierra,* 535 U.S. at 315 n. 10, 122 S.Ct. 1465 (listing three factors), *and Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 538–39, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (same), *with Kelo v. City of New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (city's exercise of eminent domain power to aid economic development plan satisfied constitutional public-use requirement, even though city intended to transfer the property taken from one private party to another private party).

tionally, in denying Lost Tree's permit for Plat 57, the Corps concluded, after evaluation of the parcel, that Plat 57 "is a high-quality, tidally-influenced, mangrove swamp of the Indian River Lagoon and serves an integral role in the overall health of this partially-impaired watershed." PX 114 at LTVC014041–42; *id.* at LTVC014046 (concluding that the wetlands at Plat 57 are "very high-value"). That finding is suspect, given the trenching and mounding that had occurred on Plat 57 for mosquito-control purposes, *see* Exhibit A, *infra,* and also the Town's and state court's findings that the wetlands involved were marginal. *See supra,* at 425 n. 23.

4. *Synopsis.*

Respecting the *Penn Central* factors, the character of the government's action tends to favor Lost Tree because the Corps concededly treated Lost Tree more adversely than it would have treated other applicants for the same permit and because prior mosquito-control actions taken on the property had reduced its value as a wetland. An assess-

ment of the investment-backed expectations is closely divided. Lost Tree admittedly had little expectation regarding Plat 57 when purchased, but the adventitious proposal by The Estuary at McCuller's Point, available mitigation measures, and state support in light of those mitigation measures engendered objectively reasonable expectations on Lost Tree's part. Nonetheless, the economic-impact factor is dispositive. A diminution in value of 58.4% due to the regulatory action is insufficient to give rise to a taking despite the weight of the other *Penn Central* factors.

## CONCLUSION

For the stated reasons, the court finds that the denial of the Plat 57 Permit Application has not effected a taking of Lost Tree Village Corporation's property. Rather, the court finds that the denial resulted in a noncompensable diminution in the value of Lost Tree's property. The clerk shall enter judgment for the government in accord with this disposition.

It is so ORDERED.