# United States Court of Appeals
# for the Federal Circuit

---

**LOST TREE VILLAGE CORPORATION,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5008

---

Appeal from the United States Court of Federal Claims in Case No. 08-CV-117, Judge Charles F. Lettow.

---

Decided: January 10, 2013

---

JERRY STOUCK, Greenberg Traurig LLP, of Washington, DC, argued for plaintiff-appellant.

MATTHEW LITTLETON, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was IGNACIA S. MORENO, Assistant Attorney General.

PAUL J. BEARD, II, Pacific Legal Foundation, of Sacramento, California, for amicus curiae Pacific Legal Foundation.

MARY V. DiCRESCENZO, National Association of Home Builders, of Washington, DC, for amicus curiae National Association of Home Builders.

———————————

Before RADER, *Chief Judge*, NEWMAN and REYNA, *Circuit Judges*.

RADER, *Chief Judge*.

The United States Court of Federal Claims determined that the Army Corps of Engineers did not effect a regulatory taking compensable under the Fifth Amendment when it denied Lost Tree Village Corporation's application for a permit to fill wetlands on its 4.99 acre plat (Plat 57). In reaching this conclusion, the Court of Federal Claims found Lost Tree's parcel as a whole includes Plat 57, a neighboring upland plat (Plat 55), and scattered wetlands in the vicinity owned by Lost Tree at the time the permit was denied. Because the Court of Federal Claims erred in its determination of the relevant parcel, this court reverses and remands for further proceedings.

I

In 1968, Lost Tree Village Corporation (Lost Tree) entered an Option Agreement to purchase approximately 2,750 acres of property on Florida's mid-Atlantic coast, near the City of Vero Beach. The property covered by the Option Agreement encompasses a barrier island on the Atlantic Ocean, which is bisected by the A-1-A Highway, and stretches westward to interior land and islands on the Indian River. Lost Tree purchased substantially all of the land covered by the Option Agreement in a series of transactions during the period 1969–1974. In 1974, Lost Tree purchased the 4.99 acres now known as Plat 57 as

part of a transaction in which it acquired the entire peninsula on which Plat 57 is located (known as the Island of John's Island), Gem Island, and other parcels in and along the Indian River.

Beginning in 1969 and continuing through the mid-1990s, Lost Tree developed approximately 1,300 acres of the property purchased under the 1968 Option Agreement into the upscale gated residential community of John's Island. The John's Island community includes most of Lost Tree's holdings on the barrier island, Gem Island, and the Island of John's Island. The John's Island community also includes some property that was not covered by the 1968 Option Agreement and was never owned by Lost Tree. Lost Tree built the infrastructure for the community, including utilities, sewage systems, and the majority of the roads and bridges within the community. The community includes two golf courses, a beach club, a private hotel, condominiums, and single family homes. The map below shows the borders of the John's Island community outlined in red; Lost Tree's original holdings in the vicinity are shaded green. *Appellee Br.* at 8 (modified from trial exhibit).



Lost Tree's development of the John's Island community began on the Atlantic coast and eventually moved to the Island of John's Island and Gem Island in the early 1980s. The trial court found development of the community proceeded in a "piecemeal" manner, by "opportunistic progression," rather than strictly following any master development plan. *Lost Tree Village Corp. v. United*

*States*, 100 Fed. Cl. 412, 431–32 (2011). The Island of John's Island and Gem Island were developed over a period of many years, and involved numerous distinct plat recordings and government permits. *Id.*

In 1980, Lost Tree submitted to the Army Corps of Engineers (Corps) an application for a permit under § 404 of the Clean Water Act, 33 U.S.C. § 1344, to make numerous infrastructure improvements including construction of causeways connecting the barrier island, Gem Island, and the Island of John's Island. The application also sought approval to dredge canals and fill some wetland areas to create developable lots. Lost Tree's application was accompanied by plans and drawings for its proposed development of the Island of John's Island and Gem Island (the 1980 Development Plan). A drawing in the 1980 Development Plan depicts a substantial portion of Plat 57, as well as other areas, shaded in green and labeled "wildlife preserve." *Lost Tree*, 100 Fed. Cl. at 416.

The Corps did not act on Lost Tree's 1980 permit application as submitted because the State of Florida required numerous changes to Lost Tree's plans. Lost Tree submitted a revised proposal to the Corps in 1982. The proposal stated that "all originally proposed project features are being deleted from this application except the bridge from John[']s [Island] to Gem Island and its approaches." *Id.* at 417 (alterations in original). The Corps approved a modified version of the 1982 application, and development of the Island of John's Island and Gem Island proceeded throughout the 1980s and 1990s "in a manner that diverged in significant ways from the 1980 Application." *Id.* at 431. During development, Lost Tree sought and received two additional § 404 permits for infrastructure improvements and construction of canals, and reserved various parcels as conservation easements by deed restrictions recorded in favor of the local, state, or

federal government.  Plat 57 was not among the land dedicated for conservation.

Plat 57 lies on Stingaree Point, a small peninsula located on the southwestern portion of the Island of John's Island.  Lost Tree developed Stingaree Point in 1985–1986.  At that time, the company built Stingaree Point Road, installed water and sewer lines, and recorded Plat 40, which is comprised of six lots to the south and west of the road.  Also in 1985, Lost Tree "stubbed out" water and sewer lines to Plat 40 and to unplatted land on the eastern end of the Point that was later recorded as Plat 55.  Lost Tree sold the six lots on Plat 40 within a few years after the plat was recorded.  Homes have been built on those properties.

To east of Plat 40, on the north side of Stingaree Point Road, is the 4.99 acre tract eventually recorded as Plat 57.  Plat 57 consists of 1.41 acres of submerged lands and 3.58 acres of wetlands with some upland mounds installed by Florida's "Mosquito Control" authority.  To the east of Plat 57 is a mosquito control impoundment, a narrow, 323 foot long shoulder along the north side of the road, and then Plat 55.  Although Lost Tree neither "stubbed out" nor recorded Plat 57 when it developed the rest of Stingaree Point, an April 1986 appraisal stated that "Stingaree Point development is substantially completed, with the exception of the entrance area, landscaping, and a final layer of asphalt on the road." *Id.* at 418.

As the trial court found, Plat 57 was "ignored entirely" during Lost Tree's development of Stingaree Point and the rest of John's Island.  *Id.* at 433.  In 1994, when "most knowledgeable people considered development of the community of John's Island to have been completed, the property constituting Plat 57 had not been platted, utilities had not been extended to it, nor had it been

dedicated to any use such as mitigation for a project on other plats." *Id.*

Lost Tree did not consider Plat 57 for development until approximately 2002, when the company learned it would obtain "mitigation credits" as a result of improvements a neighboring landowner had agreed to make as part of a development project. Lost Tree identified Plat 57 as a property that could be developed profitably to exploit the mitigation credits. In August 2002, Lost Tree filed an application with the Town of Indian River Shores requesting approval for a preliminary plat and permission to fill 2.13 acres of wetland on the property. The company then filed a corresponding application for a § 404 wetlands fill permit from the Corps. Lost Tree obtained all state and local approvals to develop Plat 57 into a site for one residential home. The Corps, however, denied Lost Tree's § 404 permit application in August 2004, stating that less environmentally damaging alternatives were available, and that Lost Tree "has had very reasonable use of its land at John's Island." *Id.* at 425.

## II

The Court of Federal Claims held a seven-day trial, after which it denied Lost Tree's takings claim. The trial court rejected the government's argument that the entire John's Island community is the relevant parcel for the takings analysis, finding Lost Tree's development of Plat 57 was "physically and temporally remote from" its development of the rest of the community. *Id.* at 433 (quoting *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1381 (Fed. Cir. 2000)). The court also rejected Lost Tree's argument that the relevant parcel was Plat 57 alone. Instead, the court determined that the relevant parcel is "Plat 57 and Plat 55, plus those scattered wetlands still owned by Lost Tree within the community of John's

Island." *Id.* at 435. The court found that, while Plats 55 and 57 are "distinct legal parcels, they are undoubtedly contiguous." *Id.* at 434. Further, it found Lost Tree has comparable usage objectives for the two plats, because it hopes to sell for profit the lots on each plat.

Based on its relevant parcel determination, the trial court found the Corps' denial of the § 404 permit application for Plat 57 "diminished the value of Lost Tree's property by approximately 58.4%." *Id.* at 437. After analyzing the factors set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), the court found the diminution in value insufficient support a takings claim. Lost Tree appeals, and this court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## III

"Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998). This court reviews the Court of Federal Claims' conclusions of law without deference and reviews its findings of fact for clear error. *Id.*

Lost Tree asserts the denial of a § 404 permit to fill wetlands on Plat 57 by the Corps effectively deprived Lost Tree of its property such that it is entitled to just compensation under the Fifth Amendment. While the Government's authority to "prevent a property owner from filling or otherwise injuring or destroying vital wetlands" is unquestioned, the issue is whether the denial of a fill permit for a particular project imposes a disproportionate loss on the affected landowner. *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1175 (Fed. Cir. 1994); *see Palazzolo v. Rhode Island*, 533 U.S. 606, 617–18 (2001) (holding regulatory takings inquiries are "informed by the

purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960))).

Regulations requiring land to be left substantially in its natural state—such as when a wetlands fill permit is denied—may sometimes "leave the owner of land without economically beneficial or productive options for its use." *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1018 (1992). In the "relatively rare situations where the government has deprived a landowner of all economically beneficial uses," the regulatory action is recognized as a "categorical taking" that must be compensated. *Id.*; *see Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1564–65 (Fed. Cir. 1994). The only exception to compensation for such categorical takings is where the regulations prohibit a use that was not part of the landowner's title to begin with; that is, a limitation that inheres "in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas*, 505 U.S. at 1029.

Most regulatory takings cases, however, are analyzed under the framework set out in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) ("Anything less than a 'complete elimination of value,' or a 'total loss' . . . would require the kind of analysis applied in *Penn Central*." (quoting *Lucas*, 505 U.S. at 1019–20 n.8)). *Penn Central* recognizes that the regulatory takings analysis is an "essentially ad hoc, factual inquiry," which requires courts to evaluate (1) the character of the governmental action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct

investment-backed expectations. 438 U.S. at 124. If the court determines that the regulation "goes too far" such that it should be recognized as a taking of private property for public use, then the government must provide just compensation. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

In many cases, as here, the definition of the relevant parcel of land is a crucial antecedent that determines the extent of the economic impact wrought by the regulation. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 496 (1987) ("Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'") (quoting Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165, 1192 (1967)); *Palm Beach Isles*, 208 F.3d at 1380 (discussing the "denominator problem"). Definition of the relevant parcel affects not only whether a particular regulation is a categorical taking under *Lucas*, but also affects the *Penn Central* inquiry into the economic impact of the regulation on the claimant and on investment-backed expectations. The relevant parcel determination is a question of law based on underlying facts. *Palm Beach Isles*, 208 F.3d at 1380.

The Supreme Court has not settled the question of how to determine the relevant parcel in regulatory takings cases, but it has provided some helpful guideposts. *See Lucas*, 505 U.S. at 1016 n.7. First, the property interest taken is not defined in terms of the regulation being challenged; the takings analysis must focus on "the parcel as a whole." *Tahoe-Sierra*, 535 U.S. at 331 (quoting *Penn Central*, 438 U.S. at 130-131). Second, the

"parcel as a whole" does not extend to all of a landowner's disparate holdings in the vicinity of the regulated property. *Lucas*, 505 U.S. 1003, 1017 n.7 (characterizing as "extreme" and "unsupportable" the state court's analysis in *Penn Central Transportation Co. v. New York City*, 42 N.Y.2d 324, 333–34 (1977), *aff'd*, 438 U.S. 104 (1978), which examined the diminution in a particular parcel's value in light of the total value of the takings claimant's other holdings in the vicinity).

This court has taken a "flexible approach, designed to account for factual nuances," in determining the relevant parcel where the landowner holds (or has previously held) other property in the vicinity. *Loveladies*, 28 F.3d at 1181. In this inquiry, the "critical issue is 'the economic expectations of the claimant with regard to the property.'" *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005) (quoting *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999)). When a "developer treats several legally distinct parcels as a single economic unit, together they may constitute the relevant parcel." *Forest Props.*, 177 F.3d at 1365 (holding relevant parcel included 53 upland acres and 9 acres of lake bottom where tracts were acquired at different times but "economic reality" was that owner treated the property as single integrated project).

Conversely, even when contiguous land is purchased in a single transaction, the relevant parcel may be a subset of the original purchase where the owner develops distinct parcels at different times and treats the parcels as distinct economic units. *Palm Beach Isles*, 208 F.3d at 1381 (holding relevant parcel consisted of 50.7 acre wetland portion of original 311.7 acre purchase where landowner "never planned to develop the parcels as a single unit," and sold 261 acres of upland, oceanfront property prior to enactment of relevant regulatory scheme); *Love-*

*ladies*, 28 F.3d at 1181 (holding relevant parcel consisted of 12.5 acres from original 250 acre purchase where landowner developed and sold 199 acres before regulatory scheme was enacted and deeded remaining 38.5 acres to state in exchange for development permits).

Here, Lost Tree did not treat Plat 57 as part of the same economic unit as other land it developed into the John's Island community. The trial court correctly found that Lost Tree did not include Plat 57 in its formal or informal development plans for the community. *Lost Tree*, 100 Fed. Cl. at 431–32. The only proposal that ever addressed Plat 57 was the unapproved 1980 Permit Application. While the 1980 application proposed dedicating Plat 57 as a wildlife preserve to mitigate other development, Lost Tree withdrew that application. Thus, when the Corps eventually granted Lost Tree's permit application, Plat 57 had no designated use.

The government argues Plat 57 was informally part of the John's Island development because Lost Tree intentionally included undeveloped land within the perimeter of its gated community. Lost Tree advertised such "open spaces" as part of the unique environment offered by John's Island. However, Lost Tree expressly planned open spaces in its development of the community, through the use of large lots for single family homes, and inclusion of golf courses and dedicated conservation wetlands. Lost Tree's failure to plan for Plat 57 even as open space supports the trial court's conclusion that the parcel was "ignored"—rather than intentionally left undeveloped—when the company carried out the John's Island project. *Id.* at 433.

Lost Tree's actual course of development further demonstrates that it did not treat Plat 57 as part of the John's Island community. Lost Tree did not seek a fill permit or

run utility service to the area that became Plat 57 when it developed the rest of Stingaree Point. Plat 55, by contrast, was brought to grade and water and sewer lines were stubbed out to that area. Although the company did not immediately plat the land that became Plat 55, it developed it in the mid-1980s in preparation for eventual sale as part of the John's Island community. Plat 57, by contrast, was absent from Lost Tree's development plans until 2002—at least seven years after the development of the John's Island community was considered complete. *Id.*

Indeed, the record shows that after 1982, Lost Tree was essentially unaware of its ownership of Plat 57 until the company prepared an inventory of its residual properties in 1995. At that time, Lost Tree had already transitioned its business from real estate development to focus on investment in commercial properties. The company also was working to divest itself of remaining real estate holdings in the vicinity of John's Island. When the Corps denied Lost Tree's § 404 permit application in 2002, the company held only the "West Acreage," which lies well outside the John's Island community, Plat 55, Plat 57, and scattered wetlands within John's Island. The objective evidence of Lost Tree's actions demonstrates that the company considered the John's Island community completed long before it proposed to fill wetlands on Plat 57. The company's long hiatus from development efforts reinforces the conclusion that Lost Tree did not consider Plat 57 part of the same economic unit as the John's Island community.

In short, this court sees no error in the trial court's factual findings that "Lost Tree's belated decision to develop Plat 57 was not part of its planned actual or projected use of the property constituting the community of John's Island." *Id.* This finding, however, conflicts

with the court's conclusion that the relevant parcel comprises not just Plat 57, but also Plat 55 and "scattered wetlands still owned by Lost Tree within the community of John's Island." *Id.* at 435. Unlike Plat 57, Lost Tree treated Plat 55 as part of the John's Island community, developing it for eventual sale as three single family home sites at the same time that it developed Plat 40 on Stingaree Point.

The Court of Federal Claims erred by aggregating Plat 57, Plat 55, and the scattered wetlands as the relevant parcel. The only links between the two plats identified by the trial court are: 1) they are connected by the 323 foot strip of land owned by Lost Tree and therefore "undoubtedly contiguous," and 2) both currently are held with the "usage objective[ ] . . . to sell for profit the lots" on each plat. *Id.* at 434. Similarly, the scattered wetlands are only linked to Plat 57 by their geographic location within the gated community of John's Island. Here, the mere fact that the properties are commonly owned and located in the same vicinity is an insufficient basis on which to find they constitute a single parcel for purposes of the takings analysis. *Lucas*, 505 U.S. 1003, 1017 n.7; *Loveladies*, 28 F.3d at 1180 (holding relevant parcel excludes 6.4 acres of previously-developed uplands purchased in same transaction as regulated parcel and owned by claimant when § 404 permit was denied).

After a careful review of the entire record, this court determines that the relevant parcel is Plat 57 alone. The trial court's factual findings support the conclusion that Lost Tree had distinct economic expectations for each of Plat 57, Plat 55, and its scattered wetland holdings in the vicinity. Because the Court of Federal Claims erred in its determination of the relevant parcel, this court reverses the judgment and remands for further proceedings. On remand, the court first should determine the loss in

economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the § 404 permit, and then apply the appropriate framework to determine whether a compensable taking occurred. In determining the loss in value to Plat 57, the court may revisit the property values it adopted in the course of determining the impact of the Plat 57 permit denial on Lost Tree under its definition of the relevant parcel. *See Lost Tree*, 100 Fed. Cl. at 437–38.

## IV.

For the reasons set forth above, the judgment of the Court of Federal Claims is reversed and remanded for further proceedings.

**REVERSED AND REMANDED**