# United States Court of Appeals
# for the Federal Circuit

---

**LOST TREE VILLAGE CORPORATION,**
*Plaintiff-Appellee*

v.

**UNITED STATES,**
*Defendant-Appellant*

---

2014-5093

---

Appeal from the United States Court of Federal Claims in No. 1:08-cv-00117-CFL, Judge Charles F. Lettow.

---

Decided: June 1, 2015

---

JERRY STOUCK, Greenberg Traurig LLP, Washington DC, argued for plaintiff-appellee.

MATTHEW LITTLETON, Environment and Natural Resources Division, United States Department of Justice, argued for defendant-appellant. Also represented by KATHERINE J. BARTON, SAM HIRSCH.

MARK MILLER, Pacific Legal Foundation. Palm Beach Gardens, FL, for amici curiae Pacific Legal Foundation, National Association of Home Builders. Also represented by CHRISTINA M. MARTIN.

_____

Before PROST, *Chief Judge,* NEWMAN, and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

On remand from *Lost Tree Village Corp. v. United States* ("*Lost Tree I*"), 707 F.3d 1286 (Fed. Cir. 2013), the Court of Federal Claims held that the government's denial of Lost Tree Village Corporation's application for a permit to fill wetlands on a 4.99 acre plat ("Plat 57") constituted a per se regulatory taking under *Lucas v. South Carolina Coastal*, 505 U.S. 1003 (1992), and, alternatively, a regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). We affirm that a *Lucas* taking occurred because the government's permit denial eliminated all value stemming from Plat 57's possible economic uses. We do not reach the trial court's alternate holding under *Penn Central.*

## BACKGROUND

In 1968, Lost Tree entered into an option agreement to purchase approximately 2,750 acres of property on the mid-Atlantic coast of Florida.[1] The agreement gave Lost Tree the option to purchase various parcels of land, including a barrier island on the Atlantic coast, a peninsula west of the barrier island bordering the Indian River (known as the "Island of John's Island"), and other islands in the Indian River, including Gem Island and McCuller's Point. From 1969 to 1974, Lost Tree purchased most of the land covered by the option agreement, including half of McCuller's Point, the Island of John's Island, and Gem

_____

[1]    *Lost Tree I* contains a thorough description of the significant volume of facts giving rise to this dispute. 707 F.3d at 1288–91. We include only facts necessary for this opinion.

Island. The Island of John's Island and Gem Island include the 4.99 acres now known as Plat 57.

Beginning in 1969 and continuing through the mid-1990s, Lost Tree developed approximately 1,300 acres of the property purchased under the option agreement into the gated residential community of John's Island. The John's Island community includes property on the barrier island, Gem Island, and the Island of John's Island. The community includes single family homes, a private hotel, condominiums, two golf courses, and a beach club.

Plat 57 is an undeveloped plat that lies on Stingaree Point, a small southerly peninsula on the Island of John's Island and Gem Island. Plat 57 consists of submerged lands and wetlands that have been disturbed by upland mounds vegetated by an invasive pepper species and by ditches installed for mosquito control. Though Lost Tree developed Stingaree Point and land bordering Plat 57, Lost Tree had no plans of developing Plat 57 until 2002.

In early 2002, Lost Tree learned that a developer applied for a wetlands fill permit for land south of Plat 57. As mitigation for the permit, the developer proposed improvements to a mosquito control impoundment on McCuller's Point. Because Lost Tree owned land on McCuller's Point, permitting authorities required Lost Tree's consent to the proposed mitigation. Lost Tree withheld approval and instead sought permitting credits in exchange for the developer's proposed improvements.

To take advantage of the potential permitting credits, Lost Tree sought permits and approvals required to develop Plat 57. In August 2002, Lost Tree submitted an application to the Town of Indian River Shores requesting approval for a preliminary plat and permission to fill some of the wetland on Plat 57. Lost Tree filed a corresponding application for a wetlands fill permit under § 404 of the Clean Water Act, 33 U.S.C. § 1344. The town approved Lost Tree's application, and Lost Tree obtained

zoning and other local and state permits necessary to begin developing Plat 57 into a residential lot. In August 2004, however, the Army Corps of Engineers denied Lost Tree's § 404 fill permit because the Corps determined that Lost Tree could have pursued less environmentally damaging alternatives and because Lost Tree had adequately realized its development purpose through the development of the John's Island community.

Lost Tree sued the government in the Court of Federal Claims, alleging that the government's permit denial constituted a taking under the Fifth Amendment. Lost Tree's appraiser opined that Plat 57 would be worth $25,000 without the fill permit and $4,800,000 with the permit after being developed into a residential lot. The government's appraiser opined that Plat 57 would be worth $30,000 without the permit and $4,720,000 with the permit and developed. The trial court did not determine Plat 57's loss in value because it held that the relevant parcel included Plat 57, Plat 55 (a nearby developed plat), and scattered wetlands within the John's Island community. Relying on the government's unrebutted testimony regarding the value of the relevant parcel as a whole, the trial court determined that the government's permit denial diminished the parcel's value by approximately 58.4%. *Lost Tree Vill. Corp. v. United States* ("*Lost Tree CFC I*"), 100 Fed. Cl. 412, 437 (2011). A 58.4% loss in value, while not insignificant, was not sufficient to maintain a takings claim according to the trial court. *Id.*

Lost Tree appealed that decision, and we reversed. The relevant parcel, according to the court, is Plat 57 alone because Lost Tree did not treat Plat 57 as part of the same "economic unit" as Plat 55 and the scattered wetlands included in the trial court's relevant parcel definition. *Lost Tree I*, 707 F.3d at 1293–94. We remanded to the trial court with instructions to apply the appro-

priate takings framework after determining the loss in economic value to Plat 57. *Id.* at 1295.

On remand, the trial court found that the government's permit denial diminished Plat 57's value by approximately 99.4%. *Lost Tree Vill. Corp. v. United States* ("*Lost Tree CFC II*"), 115 Fed. Cl. 219, 231 (2014). Because Lost Tree and the government valued Plat 57 similarly in *Lost Tree CFC I*, the trial court averaged the parties' original estimates to determine Plat 57's loss in value. *Id.* at 228. Without a permit, the parties' estimated values averaged to $27,500. *Id.* Plat 57's with permit value, after being developed into a residential lot, averaged to $4,760,000.[2] *Id.* at 231. After subtracting development costs from Plat 57's averaged developed value, the trial court found that Plat 57's undeveloped, with permit value would be $4,245,387.93. *Id.*

The trial court held that Plat 57's loss in value was sufficient to maintain a takings claim. Because Plat 57 lost 99.4% of its value, the court held that the government's permit denial constituted a per se taking under *Lucas*. *Id.* In large part because of the economic impact to Plat 57, the trial court alternatively held that the government's permit denial constituted a taking under *Penn Central*. *Id.* at 233. The court awarded Lost Tree $4,217,887.93 (Plat 57's as permitted value minus Plat 57's nominal value) plus interest. *Id.* The government appealed, contesting the trial court's holding under *Lucas*

---

[2]    The government argued for the first time in *Lost Tree CFC II* that Plat 57's highest value should be its value before the government denied the permit. The court allowed the government to file an evidentiary proffer to explain its new theory but ultimately rejected the proffer because the government failed to provide enough specificity regarding Plat 57's value before the permit denial. *Id.* at 230.

and its alternate holding under *Penn Central*.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

Whether a government action constitutes a taking is a question of law based on underlying facts.  *Bass Enters.*, 133 F.3d at 895.  We review the trial court's conclusions of law de novo and underlying facts for clear error.  *Id.*

Private property cannot "be taken for public use, without just compensation."  U.S. Const. amend. V.  A government regulation constitutes a taking under the Fifth Amendment if it "goes too far."  *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 412–13 (1922).  The seminal regulatory takings case, *Penn Central Transportation Co. v. New York City*, identifies three factors of particular significance in determining whether a regulation goes too far: (i) the "economic impact of the regulation on the claimant," (ii) the "extent to which the regulation has interfered with distinct investment-backed expectations," and (iii) "the character of the governmental action."  438 U.S. 104, 124 (1978).

In contrast to takings evaluated under *Penn Central*'s balancing test, two types of regulatory takings require just compensation "without case-specific inquiry into the public interest advanced in support of the restraint," *Lucas*, 505 U.S. at 1015, and without consideration of the landowner's investment-backed expectations, *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1357 (Fed. Cir. 2000).  The first is a physical invasion.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 438 (1982).  The second is a regulation depriving a landowner of "all economically beneficial uses in the name of the common good," leaving the landowner with "economically idle" property.  *Lucas*, 505 U.S. at 1019.

## I. *Lucas*

The question presented in this appeal is whether residual value arising from noneconomic uses precludes application of *Lucas* and requires application of *Penn Central*'s balancing test. Confined to its facts, *Lucas* does not answer the question. In *Lucas*, the South Carolina legislature enacted a statute that prohibited a landowner from erecting any permanent habitable structures on his land. 505 U.S. at 1009. The state trial court found that the prohibition left the property *valueless*. *Id.* The Supreme Court emphasized that the prohibition denied the landowner all "economically beneficial *uses*" of his land. *Id.* at 1019 (emphasis added). Yet the Court used the term "use" synonymously with the term "value." *See id.* at 1019 n.8. The question of whether residual value attributable to noneconomic uses precludes *Lucas*'s per se treatment was not squarely answered, however, because the affected parcel in *Lucas* retained no value of any kind. *Id.* at 1009. Subsequent Supreme Court cases emphasize that a *Lucas* taking requires a total loss in economic value, *see Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002), but Supreme Court precedent does not address the precise facts before us, in particular, the existence of residual land value derived solely from noneconomic uses.

### A. Residual Value

The trial court held that because the government's permit denial deprived Lost Tree of 99.4% of Plat 57's value, a *Lucas* taking had occurred. *Lost Tree CFC II*, 115 Fed. Cl. at 231. Recognizing that *Lucas* requires a total loss in economic value, *id.* at 228 (citing *Tahoe-Sierra*, 535 U.S. at 330), the trial court explained that Plat 57's residual value "does not reflect any *economic use*." *Id.* at 231 (emphasis added). Plat 57's residual value stems from environmental value as wetland. *Id.* at 231 n.9.

Thus, Plat 57's residual value is not *economic* value, and hence *Lucas* applies.

The government argues that *Lucas* is about *value*, no matter its source. According to the government, if a regulated parcel retains any value, including environmental value, the landowner cannot maintain a *Lucas* claim. Lost Tree and Amicus Curiae respond that *Lucas* is about *use*. If a regulation deprives a landowner of all land use, *Lucas*'s per se treatment is appropriate.

We agree with the trial court that a *Lucas* claim falls somewhere between the parties' interpretations. While *Lucas* itself does not squarely address the issue, this court's precedent does. In *Loveladies Harbor, Inc. v. United States*, the government denied plaintiffs a § 404 fill permit. 28 F.3d 1171, 1173 (Fed. Cir. 1994). The fair market value of the affected parcel prior to the permit denial was over $2 million. *Id.* at 1174. After the permit denial, the parcel was worth $12,500, less than one percent of its original value. *Id.* at 1175. Because the remaining value was "de minimis," the relevant parcel was "deprived of all economically feasible use," and *Lucas*'s per se treatment was appropriate. *Id.* at 1181–82.

The government argues that subsequent doctrinal developments at the Supreme Court conflict with *Loveladies Harbor*. We agree that subsequent decisions have explained that a *Lucas* taking is rare. In *Palazzolo v. Rhode Island*, the plaintiff argued that wetlands regulations reduced his land value by more than 93%. 533 U.S. 606, 616 (2001). That decrease in value was not sufficient to trigger *Lucas*'s per se treatment. *Id.* at 631. The Supreme Court more recently clarified in *Tahoe-Sierra* that *Lucas* "was limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" 535 U.S. 302, 330 (2002) (emphasis in original) (quoting *Lucas*, 505 U.S. at 1017).

We disagree that post-*Lucas* Supreme Court developments conflict with our holding in *Loveladies Harbor*. In *Palazzolo*, the 93% loss in value was insufficient to trigger *Lucas* because the landowner was left with value attributable to economic uses. As the Court explained, "[a] regulation permitting a landowner to build a substantial residence on an 18-acre parcel does not leave the property 'economically idle.'" *Palazzolo*, 533 U.S. at 631. The Court also indicated that the "State may not evade the duty to compensate on the premise that the landowner is left with a *token interest*[,]" implying that residual value does not defeat a categorical takings claim at least when residual value is not attributable to economic uses. *See id.* at 629. In *Tahoe-Sierra*, the Court addressed a "temporary" takings claim. The Court explained that 32-month moratoria on development do not deprive a landowner of all economically beneficial use because economic use can resume at the end of the moratoria. *See Tahoe-Sierra*, 535 U.S. 302, 332 ("Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted.").

The government argues that this court's precedent characterizes *Lucas* as applying only in the narrow circumstance in which all value, regardless of its source, has been lost. We disagree. After *Tahoe-Sierra*, our cases have characterized the *Lucas* inquiry in terms of "value." *See, e.g.*, *Cienega Gardens v. United States*, 331 F.3d 1319, 1344 (Fed. Cir. 2003) (*Lucas* requires loss of "100% of a property interest's value"). Aside from *Loveladies Harbor*, however, our takings jurisprudence addresses circumstances such as those in *Tahoe-Sierra* and *Palazzolo* in which economic use (and hence economic value) was merely suspended, permitted on an unaffected portion of the parcel, or not entirely destroyed. *See, e.g.*, *Seiber v. United States*, 364 F.3d 1356 (Fed. Cir. 2004); *Bass En-*

*ters. Prod. Co. v. United States*, 381 F.3d 1360 (Fed. Cir. 2004).

B.   Land Sale as an "Economic Use"

The government argues that a landowner's ability to sell an affected parcel is an economic use that precludes *Lucas*'s per se treatment. According to the government, *Lucas* classifies a sale as an economic use. The government cites this court's decision in *Conti v. United States* for the same proposition. *See* 291 F.3d 1334 (Fed. Cir. 2002). Because Plat 57 has residual value, the government argues Lost Tree's ability to sell Plat 57 precludes *Lucas*'s application.

We disagree. The government's argument incorrectly assumes that negligible noneconomic appraisal value enables a landowner to sell a regulated parcel. As the trial court found, Plat 57's residual environmental value has been reduced by mosquito abatement measures, which left isolated hummocks and stagnant eutrophic pools. *Lost Tree CFC II*, 115 Fed. Cl. at 231 n.9. The government did not produce evidence indicating that Lost Tree could sell Plat 57 in such a condition. Speculative land uses are not considered as part of a takings inquiry. *See Olson v. United States*, 292 U.S. 246, 257 (1934).

Even if we assume that Plat 57's value necessarily enables Lost Tree to sell the parcel, we disagree that all sales qualify as economic uses. When there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land. Typical economic uses enable a landowner to derive benefits from land ownership rather than requiring a landowner to sell the affected parcel. *See, e.g.*, *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984) (logging); *United States v. 50 Acres of Land*, 469 U.S. 24 (1984) (landfilling); *United States v. Fuller*, 409 U.S. 488 (1973) (livestock grazing).

Contrary to the government's assertion, *Lucas* does not suggest that a land sale qualifies as an economic use. The Court in *Lucas* referred to a "sale" as an economic use in the context of personal property whose "only economically productive use is sale or manufacture for sale." 505 U.S. at 1028 (citing *Andrus v. Allard*, 444 U.S. 51, 66–67 (1979) (a case dealing with a prohibition on the sale of eagle feathers)). The Court explained that a personal property owner should be aware of the possibility that a regulation could render personal property worthless because of the State's "traditionally high degree of control over commercial dealings." *Id.* By contrast, in the context of real property, focusing *Lucas* "solely on market value" allows "external economic forces," such as inflation, to artificially skew the takings inquiry. *Del Monte Dunes at Monterey v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996).

The government cites this court's decision in *Conti v. United States* for the proposition that a sale qualifies as an economic use. *See* 291 F.3d 1334 (Fed. Cir. 2002). In *Conti*, a regulation banned drift gillnet fishing in the Atlantic Swordfish Fishery. *Id.* at 1344. The plaintiff alleged a taking because the regulation prevented him from using his gillnet fishing gear. The Court did not apply *Lucas* in part because the claimant could offer for sale or sell his gillnet fishing gear. *Id.* *Conti*, however, deals with personal property. Aside from that distinction, the claimant's ability to sell the commercial gillnet fishing gear stemmed from a potential buyer's ability to use that gear to fish somewhere other than in the Atlantic Swordfish Fishery. *See id.* The economic use, i.e., the owner's ability to sell, stemmed from a separate economically productive use. The same cannot be said of Lost Tree's alleged ability to sell Plat 57.

The government argues that the trial court's holding will allow speculators to purchase regulated property cheaply, apply for a development permit, and, if the

permit is denied, succeed on a *Lucas* claim. We disagree. Lost Tree persuasively argues that "[i]n the real world, real estate investors do not commit capital either to undevelopable property or to long, drawn-out, expensive and uncertain takings lawsuits." Appellee Br. 21, n.7. Even if the government's hypothetical was plausible, this court considered and rejected a similar argument in *Loveladies Harbor*. 28 F.3d 1171, 1181 (Fed. Cir. 1994). The court explained that if such strategic behavior presented itself, "[o]ur precedent displays a flexible approach, designed to account for factual nuances." *Id.*

Framed differently—in the context of existing land ownership—the government's hypothetical lends support to the trial court's holding. To establish a per se claim under the government's reading of *Lucas*, a landowner would have to demonstrate that a regulation destroyed all land value, regardless of its source. Yet the fact that the landowner could make such a showing, according to the government's hypothetical, would prompt speculation giving rise to post-regulation land value. In other words, speculators would value otherwise valueless land based solely on the possibility that a *Lucas* taking could be maintained and that a takings judgment could be won. Land value resulting from such speculation would defeat the very *Lucas* claim on which the speculation was based.

## II.  Loss in Market Value

Because the trial court calculated Plat 57's loss in value by subtracting Plat 57's value without a permit from Plat 57's value with a permit, the government argues that the trial court overstated the economic impact to Plat 57. The government contends that the trial court should have subtracted Plat 57's value without a permit from Plat 57's demonstrated value before the permit denial (i.e., Plat 57's purchase price).

We disagree. Plat 57's value with a permit reflects Plat 57's "highest and best use." The highest and best use

of a parcel is "the reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *Olson*, 292 U.S. at 255. As the trial court understood, the government cannot rely on the regulatory taking at issue to reduce the fair market value of an affected parcel. *See Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed. Cir. 1986).

## CONCLUSION

We affirm the trial court's holding that the government's permit denial constituted a per se regulatory taking under *Lucas* because Plat 57's residual value is not attributable to any economic uses. *Lucas* does not require a balancing of the *Penn Central* factors, and thus we do not address the trial court's alternate holding under *Penn Central*.

**AFFIRMED**